(77 South. 159)

INSURANCE CO. OF NORTH AMERICA v. WILLIAMS. (8 Div. 944.)

(Supreme Court of Alabama. Nov. 15, 1917.)

1. INSURANCE &#x27FE;375(1) — FORFEITURE — WAIVER.

Forfeitures provided in an insurance policy may be waived by an agent having authority and full knowledge of the facts of the forfeiture, but not every agent may waive such important contract provisions.

2. EVIDENCE &#x27FE;258(1)—AGENCY—DECLARATIONS.

Where the fact of agency rests in parol, or is to be inferred from the conduct of the principal, and there is evidence tending to show the agency, the agent's acts or declarations are admissible in evidence, on the question of waiver vel non of the contract provisions, notwithstanding a policy provision against any waiver unless written upon or attached to the policy.

3. INSURANCE &#x27FE;642—DEMURRER—GROUNDS —MATTER NOT APPEARING ON FACE OF PLEADING.

Where alleged "rider agreement" was not set out in or made a part of either complaint or plea, its effect as modifying the policy sued on could not be considered on demurrer to plea of breach of overinsurance limitation.

4. INSURANCE &#x27FE;336(6)—CONDITIONS—ADDITIONAL INSURANCE.

The purpose of overinsurance policy limitations being to prevent fraud, and the public, as well as the assurer, being interested in preventing a situation in which a fire would be profitable to the assured, such clauses should receive a fair and reasonable interpretation, according to their terms and obvious import.

5. INSURANCE &#x27FE;336(6)—CONDITIONS—ADDITIONAL INSURANCE.

Where policy contained overinsurance limitation, and limited additional insurance to $10,-000, procurement of additional insurance of $10,500 without authorization by insurer forfeited the policy.

6. INSURANCE &#x27FE;335(3)—FORFEITURE—IRON-SAFE CLAUSE.

Where the insured's books which survived the fire were insufficient to show the quantity and value of insured merchandise at the time of the fire, unless aided by statements of assured as to the nature of the several items and values thereof, there was such noncompliance with the bookkeeping requirements of the "iron-

safe clause" of the policy as forfeited the policy.

7. INSURANCE &#x27FE;335(3)—FORFEITURE—IRON-SAFE CLAUSE.

Insured's ledger containing only a record of purchases by "bill," without other description of the goods or articles represented thereby, was not, without more, a substantial compliance with the bookkeeping requirements of the "iron-safe clause" of his policy.

8. EVIDENCE &#x27FE;445(1)—PAROL EVIDENCE — SUBSEQUENT AGREEMENT.

That a policy is written does not prevent its change or waiver of its conditions by subsequent parol agreement, notwithstanding a limitation that waivers must be in writing to bind the assurer.

9. INSURANCE &#x27FE;376(1)—NONWAIVER AGREEMENT.

The status quo of the parties to a policy may be maintained by a nonwaiver agreement entered into by them before and at the time of investigation and attempted adjustment of loss.

10. INSURANCE &#x27FE;376(1) — NONWAIVER AGREEMENT.

A nonwaiver agreement expressly agreeing that "any action taken, request made, or information received by said company or companies, while investigating and ascertaining the cause of said fire, and the amount of loss or damage, shall not in any respect or particular change, waive, determine, invalidate, or forfeit any of the terms, conditions, or requirements of the policy or policies of insurance of the company or companies whose names are signed hereto, or any of the rights of any of the parties hereto," etc., precluded either party from pleading or introducing evidence of a parol waiver of his adversary's rights under the policy during the period covered by the agreement.

Appeal from Law and Equity Court, Morgan County; Thomas W. Wert, Judge.

Action by P. W. Williams against the Insurance Company of North America. From judgment for plaintiff, defendant appeals. Reversed and remanded.

Steiner, Crum & Weil, of Montgomery, and Callahan & Harris, of Decatur, for appellant. Deedmeyer & Birch, of Birmingham, E. W. Godbey, of Decatur, and John R. Sample and Porter M. Brindley, both of Hartsells, for appellee.

THOMAS, J. The complaint, in code form, is based on two policies of insurance, issued jointly by the Insurance Company of North America and the Fire Association of Philadelphia, under the name Philadelphia Underwriters. By the terms of these policies said companies are each liable for one-half of the insurance. Both cases are submitted together. The questions involved are identical.

Appropriate assignments of error challenge the right of recovery of the statutory penalty provided in suits on policies issued by companies belonging, at the time of the issuance of the policy, to a tariff association. The statutory right of recovery of 25 per cent., in addition to the face of the policy, is given by sections 4594 and 4595 of the Code of 1907, as amended by the act of April 7, 1911 (Gen. Acts 1911, p. 316). The right of the assured to recover the penalty as pre-

&#x27FE;For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

scribed by the statute was upheld in Southern States Fire Insurance Co. v. Kronenberg, 199 Ala. 164, 74 South. 63.

To the complaint, containing two counts, the defendant pleaded the general issue and several special pleas, setting forth, in varying phrase, a breach of the "iron-safe clause." To these pleas the plaintiff replied (2 and 3) by setting up substantial compliance with the terms of the policy, and (5, 6, 7, 8, and 9) by averring that after the fire, and after being fully informed as' to how and when and in what particulars the plaintiff had violated the terms and conditions of the policy, defendant promised plaintiff that the full amount of the policy sued on should be paid.

Demurrers to these replications being overruled, the defendant rejoined. The second rejoinder averred that, as a part of the contract, it was stipulated:

"No officer or agent or other representative of this company shall have power to waive any provision or condition of the policy except such as by the terms of this policy may be the subject of agreement indorsed hereon or added to; and as to such provisions and conditions no officer, agent, or representative shall have such power or be deemed or held to have waived such provision or condition, unless such waiver, if any, shall be written upon or attached hereto, nor shall any privilege or permission affecting the insurance under this policy exist or be claimed by the insured unless so written or attached."

And it further averred that the waiver set forth in the replication was not indorsed on said policy or attached thereto.

[1, 2] Forfeitures provided in a policy of insurance may be waived by an agent with authority and with full knowledge of the facts of the forfeiture. It is not every agent of the assurer, however, who may waive such important contract provisions. Southern States' Fire Ins. Co. v. Kronenberg, supra. Where the fact of agency rests in parol, or is to be inferred from the conduct of the principal, and there is evidence tending to show the agency, the agent's acts or declarations are admissible in evidence on the question of waiver vel non of the contract provisions (Roberts & Son v. Williams, 73 South. 502 [1]), notwithstanding the provision to the contrary set out as a part of the rejoinder. This rejoinder was not a full answer to the replication to which it was directed, that the assurer held out an actor as being its agent, or as possessing the authority assumed by such agent within the scope of its business, and that the adjustment of the loss under the policy, with full knowledge of the forfeiture, waived the same, and that the plaintiff had been misled to his detriment by the apparent authority of such agent. Day v. Home Ins. Co., 177 Ala. 600, 58 South. 549, 40 L. R. A. (N. S.) 652. The demurrer was properly sustained to the second rejoinder.

The fifth and sixth rejoinders set up a "nonwaiver agreement" entered into and executed by the plaintiff and the defendant immediately upon the adjuster's being informed of the breach of the condition of the "iron-safe clause." Demurrers to such rejoinders were improperly sustained. To this ruling we shall refer later.

Defendant filed a further plea, A, to the second count of the complaint, averring:

That the policy sued on contained the following provisions, viz.: "'This entire policy, unless otherwise provided by agreement indorsed hereon or added hereto, shall be void if the insured now has or shall hereafter make or procure any other contract of insurance, whether valid or not, on property covered in whole or in part by the policy.' The said policy contained the further provision: 'No additional insurance permitted unless the amounts are inserted by agents of the company in the blank spaces noted below, viz.' And defendant avers that following such provision there was noted on the policy, '$10,000.00 on stock.' At the time of the issuance of the policy the defendant carried on the stock of goods covered by said policy $8,500 of insurance, and on, to wit, the 4th day of December, 1914, the defendant procured another policy of insurance on said stock of merchandise for $2,000 with the Philadelphia Underwriters, which made the defendant's total insurance in said policy in addition to the policy sued on $10,500, and permission for such additional insurance was not by the defendant or any one authorized to bind it indorsed on or attached to the policy sued on."

The plea is self-correcting. Clinton Min. Co. v. Bradford, 76 South. 74, 77, 78, ante, p. 308.

The theory of plaintiff's demurrer to this plea was that the policy contemplated the procurement of additional insurance, under the circumstances therein indicated, and this consent was given by a "rider agreement," and, when attached to the policy, became the governing agreement as to concurrent or subsequent insurance, and was substituted for the original policy stipulation relating to the procurement of additional insurance; that is, if the "rider agreement," or indorsed or written consent, allowed additional insurance in a certain designated sum, but contained no penalty in the event of the breach of the provisions of such "rider" or indorsed or written consent, then, notwithstanding such penalty was contained in and provided for by the original policy, such forfeiture clause of overinsurance would not have application to the consent finding expression in the subsequent "rider" or indorsement attached to or written on the policy.

It is declared of a "rider agreement" attached to a policy of insurance that it is a part of the contract (Scharles v. Hubbard & Co., 74 Misc. Rep. 72, 131 N. Y. Supp. 848, note 30 L. R. A. 636–642), to the same extent and with a like effect as if embodied in the policy (Farmers' Bank v. Manchester Co., 106 Mo. App. 114, 80 S. W. 219), and that it supersedes its original conditions, exceptions, and provisos where it is obvious that such was the intention of the parties (N. Y., etc., Co. v. Ætna Ins. Co. [D. C.] 192 Fed. 212, affirmed, Id., 204 Fed. 255, 122 C. C. A. 523). See, also, 1 Joyce, Law of Insurance (2d Ed.) §§ 191b, 223, 224; volume 1, Cooley's Briefs,

[1] 198 Ala. 290.

Law of Insurance, 640; volume 2, Cooley's Briefs, Law of Insurance, 1476. On the subject of giving the written provisions in or on policies of insurance a controlling effect over the printed portions thereof, this court has said:

"In Bolman v. Lohman, 79 Ala. 67, it was held that, in interpreting instruments partly written and partly printed, the greater weight should be given to that which is written, for the presumption is that greater attention was bestowed on the written parts; that. a printed form is intended for general use, without reference to particular objects and aims, and that which is written is supposed to be dictated by the particular intention and purpose of the parties contracting." Tubb v. Liverpool & London & Globe Ins. Co., 106 Ala. 651, 659, 17 South. 615, 617.

[3] The complaint, however, does not set out as a part thereof the policies of insurance sued on, nor are they made a part of plea A. The plea only avers the contract provisions as to overinsurance, and a consent that a designated amount of other or subsequent insurance might be taken, without stating how the assent for the taking of the stipulated amount of other or subsequent insurance was given. Whether this consent for such other or additional insurance was a modification of the original policy by way of a "rider agreement," or by a written indorsement thereon or therein, is immaterial to the question presented for decision.

[4] The purpose of overinsurance limitations in policies is to prevent fraud. The public, as well as the assurer, is interested in preventing a situation in which a fire would be profitable to the assured. Such clauses in insurance policies ought to receive a fair and reasonable interpretation, according to their terms and obvious import. Judge Story said:

"But, be these considerations as they may, we see no reason why, as these clauses are a known part of the stipulations of the policy, they ought not to receive a fair and reasonable interpretation, according to their terms and obvious import. The insured has no right to complain, for he assents to comply with all the stipulations on his side, in order to entitle himself to the benefit of the contract, which, upon reason or principle, he has no right to ask the court to dispense with the performance of his own part of the agreement, and yet to bind the other party to obligations, which, but for those stipulations, would not have been entered into." Carpenter v. Providence-Washington Ins. Co., 16 Pet. 495, 511 (10 L. Ed. 1044).

[5] In the light of the well-considered cases, and of the object of the insertion of such a clause in the policy, we are of the opinion that the trial court committed error in sustaining plaintiff's demurrers to plea A. Queen Ins. Co. v. Young, 86 Ala. 424, 5 South. 116, 11 Am. St. Rep. 51; Phœnix Ins. Co. v. Copeland, 90 Ala. 386, 8 South. 48; Ala. State Mut. Assur. Co. v. Long, 123 Ala. 667, 26 South. 655; Home Ins. Co. of N. Y. v. Morrow, 145 Ala. 284, 39 South. 587; Home Ins. Co. v. Williams, 237 Fed. 171, 174, 150 C. C. A. 317, and authorities there collected; Interstate Fire Ins. Co. v. Nelson, 105 Miss.

437, 62 South. 425; Gross v. Colonial Assur. Co., 56 Tex. Civ. App. 627, 121 S. W. 517; Senor v. Western, etc., Co., 181 Mo. 104, 79 S. W. 687; Works et al. v. Springfield F. & M. Ins. Co., 79 S. W. 42; N. O. Ins. Ass'n v. Griffin, 66 Tex. 232, 18 S. W. 505.

The breach of the provisions of the "iron-safe clause" is presented by appropriate pleas. The waiver of such breach is set up by replications to the effect that Mr. Brame, who at such time was employed by the defendant as an adjuster, and was clothed with power to make examinations, investigations, and adjustments of the loss suffered under the policy in question, did make such investigation of the cause of the fire and the extent of the loss, and, after being fully informed as to the method in which the plaintiff kept a record of his business, and with full knowledge of the character of the books which were kept in the fireproof iron safe of the plaintiff, and which were produced by plaintiff for the inspection of the said adjuster, the said Brame recognized and treated the policy of insurance as valid and binding, and stated to plaintiff that he was perfectly satisfied with the showing made by the plaintiff, and that "the full amount of the policy" would be paid.

The provisions of the "iron-safe clause" require that the assured keep and preserve a record history of his business within the stipulated period, and produce the same for the inspection of the assurer in the event of loss by fire or by other agency contracted against. In the instant case the clause required the assured: (1) To take a complete itemized inventory of stock on hand at the specified dates; (2) to keep "a set of books," which shall "clearly and plainly present a complete record of business transacted, including all purchases, sales, and shipments, both for cash and credit," from date of the stipulated inventory "and during the continuance of [the] this policy"; (3) to keep said books and inventories "in a fireproof safe" or "in some place not exposed to a fire which would destroy" the building insured.

The effect of our decisions is that stipulations in policies of fire insurance as to the keeping and preserving of books and inventories by the assured, and as to his exhibiting them in case of loss, have for their primary purpose the preservation and exhibition, with reasonable certainty, of the record history of the conduct of the assured's business "with respect to the quantum and value of the goods destroyed," unaided by parol, except to explain the method of taking and keeping such books and inventories. Chamberlain, Trustee, v. Shawnee Fire Ins. Co., 177 Ala. 516, 519, 58 South. 267; Georgia Home Ins. Co. v. Allen, 128 Ala. 451, 30 South. 537; Hanover Fire Ins. Co. v. Crawford, 121 Ala. 258, 25 South. 912, 77 Am. St. Rep. 55; Western Assur. Co. of Toronto v. McGlathery, 115 Ala. 213, 22 South. 104, 67

Am. St. Rep. 26; Queen Ins. Co. of N. Amer. v. Vines, 174 Ala. 568, 57 South. 444; Day v. Home Ins. Co., supra; Phœnix Ins. Co. v. Sherman, 110 Va. 435, 66 S. E. 81; Houff v. German Ins. Co., 110 Va. 585, 66 S. E. 831.

In his Insurance Briefs (volume 2, p. 1822) Mr. Cooley states that the rule of keeping books of account by the assured requires that he shall keep such books in "such a manner as they shall constitute a record of business transactions which a person of ordinary intelligence accustomed to accounts can understand" (Liverpool & London & Globe Ins. Co. v. Kearney, 180 U. S. 132, 21 Sup. Ct. 326, 45 L. Ed. 460; Amer. Cent. Ins. Co. v. Ware, 65 Ark. 336, 46 S. W. 129; Burnham v. Greenwich Ins. Co., 63 Mo. App. 85; Burnett v. American Cent. Ins. Co., 68 Mo. App. 343; North British & Mer. Ins. Co. v. Edmundson, 104 Va. 486, 52 S. E. 350; Houff v. German Ins. Co., supra); that it is "not necessary that the books should be kept according to any particular system, nor that they should be such a scientific system of books as would satisfy an expert accountant in a large business house" (2 Cooley's Briefs, Law of Insurance, p. 1822; Liverpool & London & Globe Ins. Co. v. Kearney, supra; Western Assur. Co. of Toronto v. McGlathery, 115 Ala. 213, 22 South. 104, 67 Am. St. Rep. 26; Liverpool & London & Globe Ins. Co. v. Ellington, 94 Ga. 785, 21 S. E. 1006; McNutt v. Virginia Fire & Marine Ins. Co. [Tenn. Ch. App.] 45 S. W. 61).

"The books must show with reasonable certainty a complete record of the insured's business transactions, including purchases and sales for cash or credit." Phœnix Ins. Co. v. Padgitt (Tex. Civ. App.) 42 S. W. 800; Pelican Ins. Co. v. Wilkerson, 53 Ark. 353, 13 S. W. 1103; Ætna Ins. Co. v. Fitze, 34 Tex. Civ. App. 214, 73 S. W. 370; Liverpool & L. & G. Ins. Co. v. Ellington, supra; German Ins. Co. v. Pearlstone, 18 Tex. Civ. App. 706, 45 S. W. 832; American Cent. Ins. Co. v. Ware, supra; First Nat. Bank v. Cleland, 36 Tex. Civ. App. 478, 82 S. W. 337; Beville v. Merchants' Ins. Co. (Tex. Civ. App.) 46 S. W. 914.

Of inventories required to be kept by such clauses in fire insurance policies, this court has recently declared:

"An 'inventory' means a list made by a merchant of the goods in his store, and the requirement of the policy was that the insured should take a complete itemized inventory of stock on hand within 30 days. Such an inventory not only would furnish evidence of what the stock contained at the time, but provided a starting point for the estimate to be based upon the transactions shown by the inventory and the books. * * * No case that we have seen goes to the length of holding a series of separate invoices, covering a considerable period of time during which many transactions may have been had, may by the insured be made to do service for the itemized inventory demanded by the insurer as a condition of liability and yielded by the insured in the beginning as a legitimate and reasonable stipulation. Now appellant's replications were so framed that the invoices of which they speak, and upon which he relied as a substantial equivalent for the inventory which he agreed to take within 30 days, etc. * * * That was not a compliance with the contract on the part of the insured, and any liberality of construction which would dispense with its plain terms in favor of the insured would make a contract for the parties which they saw fit not to make for themselves." Day v. Home Ins. Co., supra.

Whether an exact or a substantial compliance with the terms of the policy of insurance is required, the decisions are not in accord. Under the state of insurance business then existing, Lord Mansfield took the view that the provisions of such policies should be strictly complied with. Pawson v. Watson, Cowp., 785, 789; Dehahn v. Hartley, 1 Term R. 187 (343); Pelly v. Royal Ex., Assur. Co., 1 Burr. 347, 350. Chief Justice Holt first announced the doctrine of "substantial compliance" in construing the terms of a policy of marine insurance. Bond v. Gonsales, 2 Salk. Rep. 445. This liberal construction of contracts of insurance in behalf of the assured has found expression in modern authorities holding, for example, that a substantial compliance with the "iron-safe clause" as to keeping and preserving books and inventories contracted to be kept is all that is necessary to meet the requirement of such provisions in policies of insurance. Western Assur. Co. v. McGlathery, supra; Queen Ins. Co. v. Vines, supra; Ga. Ins. Co. v. Allen, 119 Ala. 436, 24 South. 399; Home Ins. Co. v. Williams, 237 Fed. 171, 150 C. C. A. 317; 7 Mayf. Dig. 441; Ætna Ins. Co. v. Johnson, 127 Ga. 491, 494, 56 S. E. 643, 9 L. R. A. (N. S.) 667, 9 Ann. Cas. 461; Liverpool, etc., Co. v. Ellington, supra; Jones v. Southern Ins. Co. (C. C.) 38 Fed. 19; Burnett v. Amer. Cent. Ins. Co., supra; Liverpool, etc., Co. v. Kearney, supra; Western Assur. Co. v. Redding, 68 Fed. 708, 15 C. C. A. 619; Malin v. Merc. T. M. Ins. Co., 105 Mo. App. 625, 80 S. W. 56; 3 Joyce on Ins. § 2063; 1 May, on Ins. § 187; 2 Cooley's Ins. Briefs, pp. 1822, 1824.

The rule recognized in the McGlathery Case, supra, is not modified in Chamberlain, Trustee, v. Fire Ins. Co., supra. The difference of opinion that developed in the former was as to the sufficiency of the replication to the second plea. That set forth the "iron-safe clause," and averred as a breach "that the plaintiff did not keep a set of books as therein provided." The defect in the replication thereto was the averment that assured had substantially kept a set of books from which the loss could have been ascertained, and the plaintiff offered to produce "the books and evidence to meet the defendant's demand for books claimed to be necessary, but defendant refused to allow plaintiff to do so or to receive such books and proof." The issue being joined on such pleading, it was correctly held that the "offer to produce books and evidence" rendered the replication defective. That this averment was the cause of the difference of opinion is indicated by Judge Brickell's inquiry:

"What books? Such as the stipulation in the policy required to be kept, or what books? How much of the deficiency not furnished by

the books was to be supplied by evidence, and what kind of evidence?"

There was no disagreement as to what books or other record evidence the defendant was to keep and exhibit as required by the "iron-safe clause." The difference of opinion extended only to taking issue on an insufficient replication, and not to the fact that a hiatus in bookkeeping or other record evidence may be supplied by the assured by parol evidence. 2 Cooley's Briefs, Law of Insurance, p. 1825.

If the contract provisions in this important respect be disregarded, the character, quantum, and value of the goods destroyed may be ascertained by parol evidence, rather than by the record history of the business which the assured had engaged to keep, and, in case of loss by fire, to produce for the inspection of the assurer, and as a part of the consideration of the contract of insurance.

In Home Insurance Co. v. Williams, 237 Fed. 171, 176 (150 C. C. A. 317), the court, treating of suits on other policies of insurance on the same stock of goods, said:

"Do the books kept by the plaintiff and produced by the insured enable the defendant to reasonably arrive at the amount of the loss? There is no dispute as to the books produced and their character. If they do not enable the defendant to reasonably arrive at the amount of the loss, then it was error for the court to leave to the jury to say whether such books were sufficient. The facts being undisputed, it becomes a matter of law for the court."

See Chamberlain, Trustee, v. Shawnee Fire Ins. Co., supra; Georgia Home Ins. Co. v. Allen, 119 Ala. 449, 24 South. 399; Hanover Fire Ins. Co. v. Crawford, 121 Ala. 264, 265, 25 South. 912, 77 Am. St. Rep. 55; Queen Ins. Co. v. Vines, 174 Ala. 570, 57 South. 444.

The plaintiff testified:

"I took an invoice of my stock of goods January 1, 1913, and January 1, 1914. These invoices were in my safe at the time of the fire, and I kept and produced them to the adjuster."

It is plain that witness' meaning, in the use of the word "invoice," was "inventory." The distinction between these two expressions, where they are used to aver compliance with such insurance clauses, is pointed out in Day v. Home Insurance Co., supra. Witness further testified that, when the adjuster came, witness showed him his "set of books," his ledger and cashbook, "from October 16, 1914, to the time of the fire [December 27, 1914]," a bank book ("a book that I checked against the bank"), and plaintiff's "wholsale book"— all the books that witness "kept in his safe at the time of the fire"; that he explained to the adjuster that he had lost the "cash register record" which he kept of his "entire * * * mercantile business through this register"; that he "kept a cotton account with the bank," of cotton accounts or "cotton transactions" in the fall of 1914.

Explaining his "cash register record" that was destroyed by fire, witness said:

"I would ring in a charge sale and a cash sale and received one and paid out and put in

a slip for each one showing the item, and the tickets from the register showed the amounts paid, received, on paid outs, cash sales, and credit sales. * * * At night I balanced this cash register and made a copy from the cash register to my cashbooks, showing the total amount of credit sales, total amount of cash sales, total amount paid out, and total amount received on account for the day."

Witness' explanation of the "wholesale book" produced by him was as follows:

"In the wholesale book I simply kept the name of the concern that I bought from and the total amount of the invoices. I did not put down any items. I did not put down * * * any of the items of goods mentioned in the invoices. I simply put the name of the concern I bought from and the amount of the bill. I would credit them with what I got and charge them with what I would pay. After checking up the invoices against the merchandise covered, I simply entered the total amount of the invoices. To illustrate my wholesale book, and, for instance, on page 359, the account of Ely Walker Dry Goods Company is entered, 'Ely Walker Dry Goods Company, St. Louis, Mo., forwarded account, $5,443.59,' and then underneath I have credits $4,089.44, and underneath that, 'By goods returned, $13.49,' and then July 6th, 'To check, $50.00.' That is the form in which I kept these accounts of my invoices, and that is the only account of the invoices that I kept."

The same witness (plaintiff) then introduced what he had called his "bank book," and testified that this book commenced "January 1, 1914," and that the last entry was "December 26th." Witness further testified that in addition to his mercantile business he sold buggies, wagons, mules, and bought and sold cotton; that he had no record of his cotton business in the fall of 1914, and had no record of his "other cotton transactions" except from January 1, to January 14, 1914, of the "winding up of the cotton business of 1913"; and that in the fall of 1914 he conducted his cotton business with the bank and kept a book showing such transactions that "commences on September 21, 1914," and "the last entry is December 26," 1914.

The following pertinent evidence was elicited on cross-examination: Plaintiff was asked:

"Q. Now, on this book containing the account of the First National Bank I notice an entry on January 23, 1914, in indelible pencil * * * the word 'cotton' opposite the figures '2,284.67,' the 'borrowed' written opposite the figures '1,500,' * * * and * * * opposite the figures '585.17'; and [opposite] the figures '612.38' the word 'mules,' * * * and under date February 5th, opposite the figures '137.82,' the word 'cotton,' * * * and opposite the date February 13th, before the figures '1,045.92,' the word 'cotton,' * * * and on February 18th, opposite the figures, '2,798.43,' the word 'cotton,' * * * and on March 6th two entires, two words, 'cotton,' opposite the figures '2,322.87' and '5,018.15,' and the same opposite the figures '3,127.17' and '1,757.00,' and on the 7th of March and on the 17th of March, opposite the figures '1,487.21' [the word] 'borrowed,' * * * and on the 18th, '5,984.22,' the word 'cotton,' and on May 30th, opposite '500,' the word 'borrowed.' * * * Those words written in indelible pencil are in the handwriting of Mr. Merriweather, are they? A. Yes, sir. Q. And they were put there after the fire? A. Yes, sir; I

suppose they were. Q. Now, what do these figures, '2,284.67,' represent? A. Cotton; supposed to. Q. Cotton sold? A. Yes, sir. Q. Now, can you turn to your book and show me where those figures or the aggregate of those figures appear on any of your other books? A. Well, the book was burned that those figures appeared on. Q. 'Borrowed,' that was money you borrowed in your business? A. Yes, sir. Q. That was on your cashbook that was burned? A. Yes, sir. Q. Any other book contain that? A. No, sir. Q. There is another entry I notice * * * shown on the 26th of January, '1,405.28,' the word 'cotton,' that appeared only on your book that was burned? A. Yes, sir. Q. And the same is true with respect to all those entries in indelible pencil? A. Yes, sir. Q. They appeared on your book that was burned from January to October? A. Yes, sir. Q. Now, then, here is '585.17' and '612.28,' 'mules'; that is, mules you sold? A. Yes, sir. Q. When? A. Suppose they were sold on the date that is there. Q. On that date? A. Yes, sir. Q. Paid for in cash? A. Yes, sir. Q. Is that true? A. That is what the book shows; that is what Mr. Merriweather made out; I did not recheck it. * * * Q. So Mr. Merriweather got from you the information from which he made those entries, 'mules' and 'cotton' and 'borrowed money' in indelible pencil? A. He and I together. Q. The information he got from you he wrote down in indelible pencil on those books? A. Yes, sir."

Thus was the forfeiture of the iron-safe clause shown by the plaintiff. In effect, he admitted the existence of a hiatus in his bookkeeping, as follows, as shown by the record:

· "Plaintiff was here shown a deposit slip of date January 15th, showing deposit in bank of $186, and testified that it was entered on his book as of the 14th. It read: 'Currency $160.00, silver $20.00, check us $1.00, B. of H. $5.00; total $186.00.' He testified that the deposit was for sales and collections from the store. I could not tell from looking at the deposit slip how much of it was for sales. I could not look at my books and tell what any of those separate amounts or items were. From my cashbook that was burned I could tell on any one day my total sales from my collections. I haven't that on any other book from January 1st to October 16th. I have it on my cashbook after the 16th of October. From any of the books which I have I could not tell the total of sales and collections for any day from January 1st to the 16th of October. In addition to my goods in my store, I kept some wagons and harness and things like that in a warehouse and sold some. They were in a building about 50 feet from my store. I deposited the proceeds of the sales from my wagons, buggies, and harness in the First National Bank along with my mercantile business. I could not look at my account that I kept with the bank and tell what items of deposit represent the sales of wagons, buggies, or harness. I could tell by figuring out my ledger, but it would take some little time. * * * I can take the first day, say the 16th of January, and I can go through my bank book and take all the goods sold on cerdit on the 16th and all the received ones and take my deposit slip on that day, and it will show my cash sales. That would necessitate going through my entire ledger. The only way I could tell how much money went into the bank for wagons and buggies on any one day would be to go through every man's account on that ledger as of that date. * * * I cannot turn to the book containing my bank account and state to the jury any item on it that represents wagons and buggies.' "

The bank book in question showed many items of deposit between the dates January 13 and September 1, 1914, designated, "cotton," aggregating more than $27,000, "mules," amounting to $1,179.55; and "borrowed," totaling $3,487.21. That is to say, from the "bank book" in evidence the several deposits aggregating more than $31,000 are necessary to be explained by parol evidence relating to the nature of the financial transactions of the insured which they represented, whether such transactions were sales of goods for cash, or were collections on account, or were sales of cotton or of mules, or were procured loans of money.

Plaintiff introduced as a witness his former bookkeeper, who admitted that he did not keep the books during the time when the several transactions were had, and the deposits in question were made, on cross-examination Mr. Merriweather admitted that:

"On the record of his account with the bank the entries in indelible pencil under the dates of January 23d, 26th, and 28th, and February 5th and 13th, and March 6th, 7th, 17th, and 18th, the entries being 'cotton,' 'mules,' and 'borrowed,' are in my handwriting. They were placed there by me after the fire. I got my information as to the money borrowed from Mr. Williams and as to the mules from Mr. Williams, and I had the cotton drafts, and with my familiarity with the business I knew that in no day the business ever amounted to as much as that. In some cases I had to make inquiries of Mr. Williams as to what these large amounts represented, and he told me, and I made the entries on the bank book. I found no record that would give me that information, and I had to call on Mr. Williams, or get the information from some other source. I don't know of any record that Mr. Williams had from which I could have gotten this information, and without this information that Mr. Williams furnished me of what items represented I could not have made a correct statement from his books, and I tended to say a while ago that I made a correct statement from the information that was given me and from the books submitted to me. The information I got from Mr. Williams after the fire as to what these items represented, for instance, mules, and money borrowed, was nearly a year after the transactions."

[6] Thus it is shown that the balances from the cash registered copied in the cashbook that was destroyed by fire, indicating the amounts of cash sales, amounts paid out, and amounts received on accounts from January 1st to October 16th, do not sufficiently appear on the other books and inventories produced by plaintiff to disclose the quantum and value of insured merchandise on hand at the time of the fire. Apart from what the plaintiff told him, witness Merriweather could not arrive at a valuation of the stock on hand at the time of the fire from the books kept and exhibited to him by the assured. He says that, if he had the cashbook destroyed by fire, this could be done with reasonable accuracy without resort to parol testimony. It required the statements of the assured as to the nature of the several items and the values thereof, in connection with the other

books kept, and exhibited, to disclose the history of assured's business at the time in question. Under the line of authorities we have cited, such parol evidence is not permitted to supplement the record history under the "iron-safe clause" required to be kept and exhibited to the assurer in the event of loss by fire. Such was the solemn agreement of the parties.

[7] Moreover, the ledger contained only a record of purchases by "bill," without other description of the goods or articles represented thereby. In the absence of sufficient record evidence showing that the goods or articles so purchased by the assured were subject to the terms of the policy, it is obvious that its contract provision as to assured's keeping and preserving books and inventories was not complied with. Such ledger entries, without more, were not a substantial compliance with the stipulation in question. Royal Ins. Co. v. Kline Bros., 198 Fed. 471, 117 C. C. A. 228; Everett-Ridley Co. v. Traders' Ins. Co., 121 Ga. 228, 48 S. E. 918, 104 Am. St. Rep. 99. Under the evidence the question of a substantial compliance with said clause of the policies was improperly submitted to the jury.

There was error in giving plaintiff's written charge 1 and in refusing defendant's requested written charges 2, 3, 5, and 6.

In the application of the restriction in a policy of insurance as to a waiver there is conflict of authority. If the limitation is merely that waivers must be in writing to bind the assurer, it is now generally held that such waivers may rest in parol. Westchester Fire Ins. Co. v. Earle, 33 Mich. 143, 153; German-Amer. Ins. Co. v. Humphrey, 62 Ark. 348, 35 S. W. 428, 54 Am. St. Rep. 297; McElroy v. British-Amer. Assur. Co., 94 Fed. 990, 36 C. C. A. 615.

During the incumbency of Chief Justice Cooley the Supreme Court of Michigan, through Mr. Justice Campbell, said on the subject:

"So it was held in Hatton v. Beacon Ins. Co., 16 Q. B. U. C. 316, that where an agent stated that an indorsement was unnecessary, it was a waiver of a condition requiring indorsement. It is very well settled that, except where prevented by the operation of the statute of frauds, or some other equivalent prohibition, a policy of insurance may be made or changed by parol. Sanborn v. Fireman's Ins. Co., 16 Gray [Mass.] 448 [77 Am. Dec. 419]; Kelly v. Commonwealth Ins. Co., 10 Bosworth [N. Y.] 82; Audubon v. Excelsior Ins. Co., 27 N. Y. 219; Baxter v. Massasoit Ins. Co., 13 Allen [Mass.] 320. The fact that a policy is written does not prevent its change by subsequent parol agreement. Any written contract not within the statute of frauds may be changed by parol. Seamen v. O'Hara, 29 Mich. 66. And this has been applied to the enlargement, and continuance of policies. Kennebec v. Augusta Ins. Co., 6 Gray [Mass.] 209; Trustees, First Baptist Church v. Brooklyn F. I. Co., 19 N. Y. 305." Westchester Fire Insurance Co. v. Earle, 33 Mich. 143, 152, 153.

[8] This rule now prevails in this jurisdiction. Ala. State Mut. Assur. Co. v. Long Clothing & Shoe Co., supra; U. S. Life Ins.

Co. v. Lesser, 126 Ala. 568, 28 South. 1014; Pope v. Glens Falls Ins. Co., 130 Ala. 356, 30 South. 496; Galliher v. State Mut. Life Ins. Co., 150 Ala. 543, 43 South. 833, 124 Am. St. Rep. 83; Security Mut. Life Ins. Co. v. Riley, 157 Ala. 553, 47 South. 735; Penn. Fire Ins. Co. v. Draper, 187 Ala. 103, 65 South. 923: Farmers' Mut. Ins. Co. v. Tankersley, 13 Ala. App. 524, 69 South. 410.

As a response to decisions that the adjustment of a loss with knowledge of the grounds of forfeiture, with the assurer's promise to pay the amount at which the loss is adjusted and the assured's assent thereto, recognizes and treats the policy as still in force, other courts have held that, "in the absence of any provision to the contrary," the forfeiture is deemed waived. Levy v. Peabody Ins. Co., 10 W. Va. 560, 27 Am. Rep. 598; Tillis v. Liverpool, etc., Co., 46 Fla. 268, 35 South. 171, 110 Am. St. Rep. 89. In Pool v. Milwaukee Mec. Ins. Co., 91 Wis. 530, 541, 65 N. W. 54, 51 Am. St. Rep. 919, it was declared that in an action upon a policy of fire insurance which provided that the assurer should not be held to have waived any provision or condition of the policy, or any forfeiture thereof, by any requirement, act, or proceeding on its part relating to an appraisal of the loss or an examination of the insured therein provided for, the provision is given effect as the contract of the parties. The court said:

"Of course, the defendant was at liberty to do all the things which, by the terms of the policy, it was expressly authorized to do without such waiver."

The effect of such decisions is to enforce a nonwaiver agreement provided for in the policy. Weddington v. Piedmont Fire Ins. Co., 141 N. C. 234, 54 S. E. 271, 8 Ann. Cas. 497.

[9] Under the construction by our court given to such provisions in policies of insurance (Queen Ins. Co. v. Young, supra; Ala. F. M. Assur. Co. v. Long Clothing & Shoe Co., supra; Loventhal v. Home Ins. Co., 112 Ala. 108;[1] Galliher v. State Mut. Co., supra; Com. Union Assur. Co. v. Ryalls, 169 Ala. 517, 53 South. 754; United Order of the Golden Cross v. Hooser, 160 Ala. 334, 49 South. 354), the status quo of the parties to the policy may be maintained by a nonwaiver agreement entered into by them before and at the time of the investigation and attempted adjustment of the loss. In Queen Ins. Co. v. Young, supra, our court first declared that no waiver shall be implied from the appraisal or effort at adjustment, made under an agreement, made under an agreement that it should be "without reference to any terms or conditions of the contract"; that the effect of such an agreement was to reserve the question of liability. The court said:

"An agreement that the adjustment shall be made 'without reference to any other terms and conditions of the insurance contract' is a reservation of the question of liability. Such agreement cannot be construed as more than a promise to pay the loss in the event the company is liable. Waiver of a right to claim a forfeiture

[1] 20 South. 419, 33 L. R. A. 258, 57 Am. St. Rep. 17.

for a breach committed before the loss of the property is not the legal result of an adjustment of the loss under the policy and agreement."

That the receiver of a bankrupt whose property has been destroyed by fire, and the adjuster of the company insuring the property, may enter into a nonwaiver agreement for the purpose of securing an adjustment under a policy of insurance which is alleged to have been forfeited, was declared in Day v. Home Ins. Co., 177 Ala. 611, 58 South. 552 (40 L. R. A. [N. S.] 652). Mr. Justice Sayre pertinently observed that:

"The defendant company had a right to investigate the loss without waiving forfeitures; but in view of the facility * * * the courts have predicated waivers on the slightest inconvenience caused to the insured, prudence required the nonwaiver agreement if in fact there was no intent to waive."

In Pennsylvania Fire Ins. Co. v. Draper, 187 Ala. 103, 114, 65 South. 923, the question decided involved the admission of certain declarations of an adjuster, made with full knowledge of the breach or breaches of the provisions of the policy, who, after investigation made, promised to pay the policy, "and thereby waived the breach." It was expressly stated that there was nothing in the opinion in Day v. Home Insurance Co., 177 Ala. 600, 58 South. 549, 40 L. R. A. (N. S.) 652, which in any manner militated against the conclusion reached in the Draper Case. That is to say, that under the limited terms of the nonwaiver agreement there dealt with (and set out in the opinion) and the evidence sought to be introduced declarations or promises of the adjuster made "after the investigation" were held admissible on the question of waiver. This decision was not a modification of the rule on the subject first announced in Queen Insurance Co. v. Young, supra, and later recognized and affirmed in Day v. Home Insurance Co., supra.

Moreover, there is a difference between the agreement entered into in Draper's Case and that before us for construction. The former was in the nature of a request to the adjuster to make an examination of books, papers, and other evidence of loss, for the purpose of ascertaining the amount of loss, with the understanding that such examination should not be considered an acknowledgment of any liability on the part of the insurer, or a waiver or impairment of the insured's obligations under the policy. The narrow limitations of the agreement dealt with in that case were treated and discussed in the opinion, and there construed, in the light of the strict rule of construction adhered to by the decisions of this court in such cases.

[10] The nonwaiver agreement entered into by the parties in the instant suit recited the inability of the assured to produce for the inspection of the company a "record of cash and charge sales from January 1, 1914, to October 16, 1914," by reason of its de-struction by the fire, with the request for an adjuster to investigate the circumstances surrounding the said fire, and to arrive at the amount of "loss and damage as near as possible," and expressly agreed that:

"Any action taken, request made, or information received by said company or companies, while investigating and ascertaining the cause of said fire, and the amount of loss or damage, shall not in any respect or particular change, waive, determine, invalidate, or forfeit any of the terms, conditions, or requirements of the policy or policies of insurance of the company or companies whose names are signed hereto, or any of the rights of any of the parties hereto. The intent of this agreement is to save and preserve all of the rights of all the parties, and permit an investigation of the claim and the determination of the amount of the loss and damage, in order that the party or parties making this request may not be unnecessarily delayed in his business, and without prejudice to the liability of the company or companies, party to this agreement."

Under such a contract, and under the canons of honesty and fair dealing long obtaining, neither of such contracting parties will be permitted to plead, or introduce evidence of, a parol waiver of his adversary's rights under the policy of insurance during the period covered by and within the terms of the nonwaiver agreement. Thereafter the parties are free to contract in writing or by parol as to their respective interests, rights, and liabilities under the policy.

The decision in the Draper Case will not be extended to do violence to the written contracts of parties made and entered into for the purpose of securing speedy adjustments of fire losses without a waiver of contract provisions of the policy.

It is not necessary to decide other questions assigned as error. Let the judgment of the Morgan county law and equity court be reversed, and the cause remanded.

Reversed and remanded.

ANDERSON, C. J., and MAYFIELD and SOMERVILLE, JJ., concur.