## TEDDER v. HOME INS. CO. (6 Div. 977.)

(Supreme Court of Alabama. March 19, 1925. Rehearing Denied April 16, 1925.)

**1. Insurance ☞665(3)—Iron safe clause in insurance policy violated.**

In action on fire policy, evidence *held* to show iron safe clause of policy was violated in failure to keep books and complete records of transactions, McKaskey register system of bookkeeping having been adopted, and in failure to keep such records as were kept in fireproof safe.

**2. Insurance ☞397 — Nonwaiver agreement sufficient.**

In action on fire policy, nonwaiver agreement signed by insured *held* sufficient to permit investigation of claim and determination of loss without prejudice to any rights or defenses which insurer might have.

**3. Insurance ☞397—Equivocal conduct of adjuster not sufficient to permit implication of waiver.**

Merely equivocal conduct of adjuster will not permit implication of waiver, in face of explicit contemporaneous denial of intention to do so.

**4. Insurance ☞397—Adjuster may make examination without waiving breaches, even though known to him.**

Insurance adjuster might make any examination appropriate, of circumstances of fire, conduct of insured, and amount of loss, without waiving breaches, even though known to him, and in absence of any nonwaiver agreement.

**5. Evidence ☞591—Signature of insured, to nonwaiver agreement not fraudulent.**

In action on fire policy, plaintiff's evidence *held* conclusive on him that signature of insured to nonwaiver agreement was not secured through fraud or duress.

**6. Insurance ☞397 — Nonwaiver agreement held not to prevent subsequent waiver.**

Nonwaiver agreement, protecting defenses of insurer, *held* not to prevent waiver by subsequent independent act or statement of adjuster.

**7. Insurance ☞665(8)—Promise of adjuster to pay loss not shown.**

In action on fire policy, evidence *held* not to show any offer or promise by adjuster to pay loss after execution of nonwaiver agreement, where he did no more than to state estimate as to amount of loss, and impliedly invite an offer from plaintiff on that basis.

**8. Insurance ☞397—Treatment of policy as valid or in force by adjuster will waive breaches.**

Conduct of adjuster, treating policy as valid or still in force, will operate as waiver of breaches of policy.

**9. Insurance ☞397—Conduct relied on as waiver of breaches must be inconsistent with denial of validity of policy.**

Conduct and declarations of adjuster must be inconsistent with denial of validity of policy to support contention of waiver of breaches.

**10. Insurance ☞394—Statements of adjuster that company would treat insured right and pay amount due not waiver of breaches, when considered with nonwaiver agreement.**

In action on fire policy, where insured had breached iron safe clause and signed nonwaiver agreement, statements of adjuster that company would treat him right and pay what was due, *held* not to constitute unconditional promise to pay, when considered in conjunction with nonwaiver agreement, so as to operate as waiver of that agreement.

**11. Appeal and error ☞1039(1)—Rulings on pleadings not reviewed, where result could not be changed.**

Rulings on pleadings will not be reviewed, where errors complained of would not change result.

**12. Insurance ☞668(15)—General affirmative charge for defendant not error.**

Where replication set up waiver of breaches of fire policy by insurer, which was denied by general issue and not supported by evidence, general affirmative charge for defendant *held* not error.

Appeal from Circuit Court, Winston County; Ernest Lacy, Judge.

Action on a fire insurance policy for loss of a stock of merchandise by fire, by G. B. Tedder against the Home Insurance Company. Judgment for defendant, and plaintiff appeals. Affirmed.

The policy is of the standard form, and contains the usual "iron safe clause" and warranties, and also the usual requirement as to making a sworn written report of the loss and statement of the facts.

The nonwaiver agreement referred to in the opinion is as follows:

"Haleyville, Ala., August 31, 1921.

"It is hereby mutually stipulated and agreed by and between G. B. Tedder, party of the first part, and the insurance company whose names are signed hereto, party of the second part, that any action taken, request made, or any information now or hereafter received, by said party of the second part, in or while investigating and ascertaining the cause of the fire, the amount of loss or damage, or other matters relative to the claim of the said party of the first part, for property alleged to have been lost or damaged by fire on the 22/23 day of August, 1921, shall not in any respect or particular change, waive, invalidate, or forfeit any of the terms, conditions, or requirements of the policy of the party of the second part held by the party of the first part, or any of the rights whatever of an party hereto.

"The intent of this agreement is to save and preserve all the rights of the parties, and per-

mit an investigation of the claim and the determination of the amount of the loss or damage in order that the party of the first part may not be unnecessarily delayed in his business, and that the amount of his claim may be ascertained and determined without regard to the liability of the party of the second part, and without prejudice to any rights or defenses which said party of the second part may have."

The letter received by plaintiff from defendant, dated November 22, 1921, is as follows:

"Your letter of 10th instant, addressed to the Home Insurance Company, New York, has been referred to us for attention. In reply, beg to say under nonwaiver agreement signed by you and adjuster for the Home Insurance Company on August 31, 1921, our adjuster, Mr. Cotter, endeavored to agree with you on estimate of the value of your stock at the time of the fire, which nonwaiver agreement provided that by such investigation company's rights or defenses would not in any manner be waived. The figures arrived at were your own figures, but you refused to agree thereto. Therefore, inasmuch as the company have absolute defense by reason of violation of iron safe clause, there is nothing further for the company to do but deny all liability for loss under their policy No. 97. There may have been other breaches of the policy than above mentioned, and, by specifying the above, any additional breaches which have occurred are not waived, but merely the foregoing is all of the information we have at present received. Under the above information, the company at the present time insists that the conditions of the policy have been broken, and deny any liability for loss thereunder."

Plaintiff's testimony as to his dealings with defendant's adjuster is as follows:

"Mr. Cotter, the adjuster, came to see me about a week or 10 days after the fire. I think it was about the 31st of August when Mr. Cotter came up there. I expect the first conversation, first and last took up about 30 minutes on that visit. My books were burned up in that fire. Everything in that McKaskey register was consumed. My policy was in the bank. I could not say, but Mr. Cotter and I didn't talk all together more than 30 minutes that day. At the time I told Mr. Cotter my books had been burned up. He wanted to know if I had an iron, fireproof safe. And I told him I had a safe that was bought for a fireproof safe, and he wanted to know if it protected the books and papers, and I told him it didn't, that it was at Foster's drug store, and we walked down there and looked at it, and went also and examined the building, and then back to the bank. He says, 'I can't go any further with the adjustment at present; you write to the companies you bought goods from and get duplicate invoices of all the goods you bought.' He did not ask me to sign a nonwaiver agreement at that time. It was after we had gone through with the first conversation. It was just a continuous conversation; I was just with him about a half an hour. He did not say I would have to sign it, after we completed our examination, and

later he asked me was I willing to sign that, and I told him I didn't know anything about law, and I told him if it was anything to prohibit me from drawing the insurance I did not want to sign it, and he turned to Mr. Walker, the banker, and says, 'It is not, is it, Mr. Walker?' and he says, 'No,' and he says, 'It is merely an agreement of how we well settle,' and he read it over hurriedly, and I told him I didn't know exactly what a nonwaiver agreement was, and I didn't read it. I did not have the opportunity to read it before. I signed it. Of course I could have held back and read it, but he told me what it was and proved it by Mr. Walker. At the time the agreement was handed me to sign, they did not say I couldn't read it. I signed it."

Witness continued:

"In that conversation that day, which lasted about 30 minutes, Mr. Cotter did not do anything else that day and did not have any other dealing with me before he went away from there. He told me to write and get my invoices. At the time he first came to see me, we went over to the store and then went to the bank. I met him at the bank. We had some conversation at the bank, and I went to the store, and went back to the bank. It is 75 yards from the store to the bank. Mr. Cotter first asked me about my books at the bank, and I told him they were burned up. Mr. Walker was present part of the time. I could not say he was all the time; he was working in the bank. I told him they were in the McKaskey register and were burned up in the fire. I told him I would take him and show him one of the registers, and I told him I would show him the register that was burned. It was in Foster's drug store. I went down there and showed him my register in which my books and records had been burned up. After we examined the safe, we went across the street to the building that got burned up. We just stood there and talked about the nature of the fire. I showed him about where the McKaskey was in the building and went back to the bank. A few minutes elapsed from the time we first met at the bank and went to the Foster drug store and looked at the register and went to the scene of the fire and went back to the bank. I told you how long I was with him. That did not take over 10 minutes. We got back to the bank and talked something like 20 minutes, maybe not that much or a little over. The nonwaiver agreement was the last thing talked about. * * *

"The first thing we entered into, he said that he had no starting point to pay me my insurance, that the company would treat me right. I suppose he meant I had no invoices or nothing to show I had ever been in business. He says, 'Write to these companies that you bought goods from, and get as near complete invoices from them as you can from February 1st.' That was the date of my previous inventory. I think I told him how much that inventory was. He and Mr. Walker—he told me he had gone through with my bank account and found out about what I deposited and what I checked out, and he told me—says, 'You write to these companies and get these invoices and write me, and I will be back,' and he says, 'The company will treat you right.' I couldn't

say that was all he said; I suppose there was more said. It is hard to recollect all that was said. What he said about the nonwaiver agreement was the last part of it. He filled out the nonwaiver agreement and asked me, was I willing to sign it, read it over to me, and asked me was I willing to sign it, and I says, 'I never had a case in court in my life, I don't know anything about law. If it is anything to prohibit me drawing my insurance I am not willing to sign it,' and he says, 'It is not,' and turned to Mr. Walker and says, 'Mr. Walker, it is nothing to prohibit him from drawing his insurance, is it?' and he says, 'No,' and he stated, 'It is nothing more than an agreement between us here, our settling this business satisfactorily between us; the company wants to do the right thing,' and I says, 'I will settle it under that heading.' That was the last conversation I had with him. I wrote and got a part of the invoices, as near all as I could. I got the invoices and notified him. * * *

"When Mr. Cotter was there on the last trip, he arrived at a figure of $2,699.06, or figures somewhere around that—say $2,700, to make it round numbers. Mr. Cotter arrived at this figure and told me according to my invoices that is the way he figured the loss. I told him I couldn't settle with those figures until I saw further. I can't say where he went; he went out. I left him there. We separated at that time. I didn't see him any more on that trip. He talked to me about an hour I suppose on that trip. * * * *"

On recross-examination, witness said:

"They offered to pay me $2,697.06, but I would not accept it. I could not say positively that he offered to pay that. He just figured it up and said that was all that he could find, and that the company would do me right. I did not refuse to accept the $2,697.06. I told him I could not accept it until I saw further."

Chester Tubb, of Haleyville, and W. F. Finch, of Jasper, for appellant.

Where an adjuster with authority to bind the company ascertains the facts and thereafter treats the policy as in force and effect, such action is a waiver of any defense to an action on the policy. Georgia Home Co. v. Allen, 119 Ala. 436, 24 So. 399; Id., 128 Ala. 451, 30 So. 537; Cassimus v. Scottish Union, 135 Ala. 256, 33 So. 163; Southern States Co. v. Kronenberg, 199 Ala. 164, 74 So. 63; New Brunswick Co. v Nichols, 210 Ala. 63, 97 So. 82. Where there is any evidence tending to establish liability, it is error to give the affirmative charge for defendant. Ray v. Fidelity-Phœnix, 187 Ala. 91, 65 So. 536; Fidelity-Phœnix Fire Ins. Co. v. Ray, 196 Ala. 425, 72 So. 98; Penna. Fire Co. v. Draper, 187 Ala. 103, 65 So. 923; Southern States Co. v. Kronenberg, supra. Where an agent, with knowledge of some condition which would avoid liability, issues a policy of insurance, such actions constitutes a waiver of the right to insist upon forfeiture upon such grounds. Authorities first cited.

Coleman, Coleman, Spain & Stewart, of Birmingham, and Curtis, Pennington & Pou, of Jasper, for appellee.

Plaintiff's books of account did not comply with the Iron Safe Clause of the policy. Fidelity-Phœnix Co. v. Williams, 200 Ala. 679, 77 So. 156; Ins. Co. v. Williams, 200 Ala. 681, 77 So. 159; Fire Association v. Williams, 200 Ala. 688, 77 So. 166; Home Ins. Co. v. Williams, 237 F. 171, 150 C. C. A. 317; Chamberlain v. Shawnee Co., 177 Ala. 516, 58 So. 267; Georgia Home Co. v. Allen, 119 Ala. 444, 24 So. 399; Monger v. Delaware Ins. Co., 97 Tex. 362, 79 S. W. 7; Jones v. Ætna Ins. Co., 201 Ill. App. 142. The filing of sworn statement of loss is a condition precedent to recovery. Fire Ins. Co. v. Felrath, 77 Ala. 194, 54 Am. Rep. 58; Central City Co. v. Oates, 86 Ala. 558, 6 So. 83, 11 Am. St. Rep. 67. An adjuster may investigate without waiting forfeiture. Day v. Home Ins. Co., 177 Ala. 610, 58 So. 549, 40 L. R. A. (N. S.) 652.

SOMERVILLE, J. As observed by counsel, the pleadings in this cause are multitudinous, but the real issues to be tried were few and simple.

[1] The undisputed evidence showed that plaintiff violated two provisions of the "iron safe clause" in his insurance policy, in that he kept no books and no complete records of his business transactions, and in that such records or memoranda as he kept were not kept in a fireproof safe, or at some other place not exposed to a fire that would destroy the store building. Plaintiff seems to have adopted, in a very imperfect way, what is known as the McKaskey register system of bookkeeping, which has been recently condemned as an insufficient compliance with this clause, by other courts as well as our own. Hanover Fire Ins. Co. v. Wood, 209 Ala. 380, 96 So. 250; Jones v. Ætna Ins. Co., 201 Ill. App. 142; Hughes v. Ætna Ins. Co. 148 Tenn. 293, 255 S. W. 363.

The evidence further showed without controversy that plaintiff wholly failed to render any sworn statement to the defendant insurance company of the knowledge and belief of the insured as to the time and origin of the fire, the interest of the insured or of others in the property, and of the several other matters required to be thus reported.

Plaintiff sought to avoid the effect of these breaches by showing that defendant sent an authorized adjuster to the scene of the fire about 10 days after its occurrence, who, by his conduct and declarations, with knowledge of the breaches, treated the policy as valid, and thereby waived the breaches— the more particular insistence being that this adjuster, after a full examination and understanding of the case, estimated plaintiff's loss, and offered to pay him a stated sum in settlement.

This contention of plaintiff's presented the only real issue in the trial of the case—the questions being (1) whether the adjuster in fact said or did anything, with the knowledge of the several invalidating breaches, which could amount to a waiver of them; and (2) if so, was the implied waiver avoided. in any event by the written nonwaiver agreement made by plaintiff with the adjuster·on the occasion of the first conversation between them relative to·the loss?

[2-4] The only evidence on these issues is found in the testimony of the plaintiff himself. It will be noted that, as soon as the adjuster was informed of the breaches of the iron safe clause, he told plaintiff that he could not go any further with the adjustment; and, in the same conversation, a few minutes later, in order to avoid the·implication of a waiver from his acts and declarations while pursuing his investigation of the case, he entered into the nonwaiver agreement with plaintiff.

That agreement was of the broadest character, and it was clearly sufficient, in accordance with its expressed intention to "permit an investigation of the claim and the determination of the amount of the loss or damage, * * * without prejudice to any rights or defenses which said [defendant] * * * might have." And during the period, and within the scope, of its intended operation, it must be held as effective for that purpose. Ins. Co. v. Williams, 200 Ala. 681, 77 So. 159. Merely equivocal conduct will never permit an implication of waiver or surrender of rights in the face of an explicit contemporaneous denial of any intention so to do. And, indeed, without any nonwaiver agreement, the adjuster might have made any examination he deemed appropriate of the circumstances of the fire, the conduct of the insured, and the amount of the loss, without waiving breaches, even though they were known to him. Day v. Home Ins. Co., 177 Ala. 611, 58 So. 552, 40 L. R. A. (N. S.) 652.

[5, 6] We deem it hardly necessary to remark that the evidence—plaintiff's own testimony—shows conclusively that there was no fraud or duress of any sort practiced on plaintiff in procuring his signature to the nonwaiver agreement, and he must be bound by it according to its legal effect. The case of Penn. Fire Ins. Co. v. Draper, 187 Ala. 103, 114, 65 So. 923, cited by counsel for appellant, involved a much narrower nonwaiver agreement, and also much broader acts indicative of waiver, as pointed out by Thomas, J., in Insurance Co. v. Williams, supra. It is not apt for authority here. However, the authorities are unanimous in holding that a nonwaiver agreement—

"does not prevent a waiver by subsequent independent acts or statements of insurer through its adjuster or other agent having authority to act in the premises." 26 Corp. Jur. 406, § 519, and cases cited under note 58.

[7] The evidence does not show any offer or promise by the adjuster to pay the loss, after the execution of the nonwaiver agreement; for, in view of plaintiff's narrative of his interview with him on his second visit, the adjuster did no more than to state his estimate as to the amount of the loss, and to impliedly invite an offer from plaintiff on that basis.

We think it is conclusively apparent that none of the inquiries or statements made by the adjuster during the first interview with plaintiff, relative to the fire, or the conduct of plaintiff, or for the ascertainment of the amount of the loss, can support the implication of a waiver of any of the breaches of the "iron safe clause."

The final inquiry, therefore, is, Was there any independent promise made by the adjuster, during that first continuous conversation of 30 minutes, to pay the policy loss, which amounted to a recognition of the validity of the policy, and therefore to a waiver of the known breaches? And, if so, was such implied waiver revoked or avoided by the nonwaiver agreement entered into by the parties at the conclusion of that interview?

[8] There is perhaps some confusion in the language of our cases with respect to what conduct on the part of an insurance adjuster, who has full knowledge thereof, will or may operate as a waiver of breaches of the policy, though all of them seem to agree that treating the policy as valid, or as being still in force, will have that effect. Queen Ins. Co. v. Young, 86 Ala. 424, 430, 5 So. 116, 11 Am. St. Rep. 51; Homer Ins. Co. v. Allen, 119 Ala. 436, 24 So. 399; Id., 128 Ala. 451, 30 So. 537.

[9] But manifestly there can be no implication of waiver unless the acts or declarations of the adjuster are inconsistent with a denial of the validity of the policy. Plaintiff relies on the statements, imputed by him to the adjuster, that "the company would treat him right, and would pay him what was due"; and further, that "the company would pay him the amount due on the policy."

[10] If it be conceded, for present purposes only, that these statements, standing alone, imported an unconditional promise to pay to plaintiff the amount of his loss, whatever that future adjustment might show it to be, and so constituted an implied recognition of the policy as valid, notwithstanding plaintiff's known breaches of the iron safe clause, yet we think they must be considered, along with the nonwaiver agreement, as part of a single conversation and transaction, and, so considered, the implication, otherwise permissible, is clearly rebutted. As said in Queen Ins. Co. v. Young, 86 Ala. 424, 432, 5 So. 116, 119 (11 Am. St. Rep. 51):

"It may be that if the company, with knowledge of the forfeiture, had authorized an agent to adjust the loss, a liability and a promise to pay would ordinarily be implied; but the implication may be rebutted, either by the terms of the policy, or by an agreement reserving the question of liability."

Moreover, it has been soundly held that there may be a waiver of a waiver by a subsequent agreement of the parties, as in this case. 26 Corp. Jur. 393, § 505, citing Ins. Co. of Nor. Amer. v. Caruthers (Miss.) 16 So. 911. This is not to impugn the rule that a waiver once made cannot be withdrawn by the waiving party. But a joint agreement is a different matter.

Upon the foregoing considerations, our conclusion is that there was no effectual waiver or breaches by the defendant's adjuster Cotter, nor by the defendant in any way; and it results that the general affirmative charge was properly given for the defendant.

[11] Appellant's brief invites a review of all the numerous rulings of the trial court on the pleadings. Such a labor would be useless, however, since under the principle of error without injury we would inevitably reach the result already announced.

[12] One specific insistence is that the general affirmative charge was erroneously given for defendant, for the reason that plaintiff's replications 11 and 12, setting up a waiver of breaches by defendant, were supported by the evidence, and, on the other hand, none of defendant's several rejoinders, setting up the nonwaiver agreement, were fully or conclusively proved. This contention cannot be sustained. The allegation in each of plaintiff's replications, that the adjuster "treated the policy as valid and binding," was denied by the general issue pleaded to them by defendant, and the evidence, as we have pointed out, does not support that allegation. Moreover, defendant's rejoinders 10 and 11 were substantially proved, without dispute, by the testimony of plaintiff.

The real issues seem to have been correctly decided on their merits, and we find no prejudicial error to warrant a reversal of the judgment.

Affirmed.

ANDERSON, C. J., and THOMAS and BOULDIN, JJ., concur.