ROBERTS, WILLIS & TAYLOR COMPANY ET AL. V. SUN MUTUAL INSURANCE COMPANY ET AL.

Delivered June 25, 1898.

### 1. Fire Insurance—Iron Safe Clause.

A covenant by the insured in a policy of fire insurance to keep a set of books with the last inventory of the business securely locked in a fireproof safe at night, and in case of loss to produce them, and in the event of failure to produce them, that the policy shall be void, is a warranty and not a representation, and a failure to comply therewith works a forfeiture of the policy.

### 2. Same—Summary Is Not an Inventory.

An entry in a book in which the postoffice business of a firm was kept of the summary of the contents of an inventory which gives the value of the different kinds of merchandise, without enumerating the various articles and the price thereof, is not a compliance with the "iron safe clause," requiring the insured to keep an inventory.

### 3. Same.

Clauses of policies issued by various insurance companies in which the term "itemized inventories" is used, is inadmissible for the purpose of showing that the word "inventory" alone, as used in the policy of insurance issued by another company, would not necessarily embrace "itemized lists."

### 4. Same—Special Issues—Conflict of Findings.

In an action on an insurance policy which has been avoided by a noncompliance of the insured with the "iron safe clause," a conflict of findings in the special verdict as to other matters is immaterial, and will not prevent the entry of judg-

ment in favor of the insurer, as the only judgment that could have been properly rendered.

**5. Same—Waiver of Iron Safe Clause.**

A violation of the "iron safe clause" is not waived by the statement of an agent of the insurance company that duplicate invoices were necessary in order for him to make an estimate of the loss, whereby the insured were put to the extra expense of procuring such duplicates, where the agent was making an estimate of the loss at the request of the parties, and it was agreed in writing that the examination and investigation necessarily made for that purpose should not be taken as a waiver direct or implied of the "iron safe clause."

APPEAL from Grayson. Tried below before Hon. DON A. BLISS.

*E. C. McLean* for appellants.

*Thompson & Wood,* for appellees.

RAINEY, ASSOCIATE JUSTICE.—This suit was brought by appellants on two policies issued to Burge & Allen—one by the Sun Mutual Insurance Company for $1000, $400 of which was on the building, $500 on merchandise contained in said building, and $100 on store fixtures. The other policy by the Lancashire Insurance Company for $1500 on the same merchandise contained in said building. The building and merchandise were destroyed by fire while both policies were in force; and appellants became the owners of said policies by regular transfer. There was no objection made to the two policies being embraced in the same suit.

The defendants pleaded a failure on the part of the assured to comply with a clause contained in the policies known as the "iron safe clause." Plaintiffs by supplemental petition denied that the said iron safe clause was a warranty, but that it was only a representation, and alleged a full compliance with all of the terms of the policies. And also pleaded in the alternative if there had been any violation of the provisions of said policies that the same had been waived by the adjuster, setting out how such waiver was effected, etc.

The case was submitted on special issues to the jury, and on their answers being returned judgment was rendered for plaintiffs against the Sun Mutual Insurance Company for $620.50—being the value of the house and fixtures; and that the Lancashire Insurance Company go hence without day.

*Conclusions of Fact.*—We adopt the following statement of the facts, taken from appellants' brief, namely: "It was proved on the trial that Burge & Allen were a firm composed as alleged; the execution and delivery of the policies; that the policy of the Sun Mutual contained clause permitting only $1200 additional insurance; that $1500 was taken; that F. J. Abernathy was agent of both companies, had written the policy in the Sun Mutual, and that his attention was called to the $1200 only being allowed, and that he replied it was all right, and wrote the one in

the Lancashire for $1500. It was proved that Burge & Allen owned the house and stock of merchandise insured at date of policies and at time of the fire; that the fire occurred on the night of November 25, 1892, between hours of 1 and 3 o'clock, and that the house and stock of merchandise were totally destroyed. That on March 1, 1892, they took a complete inventory of all their stock of merchandise, setting out the various articles, the amount of each and price, with extensions and footings; that this was lost in the fire; that when this itemized inventory was made that they entered in a book where they kept a record of post-office business and their individual business the following:

| | |
|---|---|
| "Dry goods, boots, shoes, and clothing | $1,210 00 |
| "Groceries and hardware | 800 00 |
| "Drugs and medicines | 420 00 |
| "Jewelry | 350 00 |
| "Books and stationery | 100 00 |
| "Fixtures | 158 45 |
| | $3,036 45 |

"That this was the last inventory taken by Burge & Allen; that during all the time they were in business they kept a set of books consisting of blotters of original entries of each sale, whether for cash or credit, ledgers in which credit sales were posted; they also kept invoices of their purchases, and also a book in which they posted each invoice as received, the total of the invoice and name of the party from whom purchased."

The following written agreement was read in evidence:

"ECTOR, December 15, 1892.

"We, the undersigned, W. R. Allen and J. T. Burge, consisting of the firm of Allen & Burge, of Ector, Fannin County, Texas, have requested C. H. Langdeau, adjuster for the Lancashire Insurance Company of England, and the Sun Mutual Insurance Company of New Orleans, to make examination of our books, invoices, and other data to determine if possible the probable loss and damage we may have sustained by reason of fire of November 25, 1892, destroying our property; and we hereby agree that such examination and investigation shall not act or be taken as any waiver direct or implied of any defense the companies may have or claim by reason of the breach of warranty as contained in the iron safe clause made a part of the policies, we having lost our detailed inventory and only having a memorandum of the account.
                (Signed)                                "BURGE & ALLEN."

The jury made the following findings of fact (only giving the question when necessary to explain the answer):

"To first, they answer that C. H. Langdeau did have authority to settle with Burge & Allen, and did have authority to waive the iron safe clause.

"The second question was as to whether Langdeau knew before the written agreement was signed by Burge & Allen that any of the books of Burge & Allen had been destroyed by fire, and whether he knew at that time whether the books preserved showed all of the credit sales prior to August 1, 1892, and when Langdeau first learned of the destruction of any of Burge & Allen's books, and how did he learn? To which they answer: We find by a written agreement signed by Burge & Allen, December 15, 1892, that the book of inventory was destroyed by fire; we find that Langdeau did not know at that time that the books preserved by Burge & Allen showed all the credit sales prior to August 1, 1892. Langdeau first learned of the destruction of Burge & Allen's books December 15, 1892, by information from Burge & Allen.

"The third question was as to whether Langdeau had fixed any amount as the amount of loss after an investigation. They find that Langdeau did approximate the sum of $1003.28.

"To fourth question, they find that Burge & Allen did not fix any amount at that time.

"To fifth question, they say that Langdeau and Burge & Allen did not fix any amount.

"To the sixth question, they find that there was a disagreement between Langdeau and Burge & Allen, and also between Langdeau, Cullers & Henry, and Roberts, Willis, Taylor Co. (as to the amount of loss), and the matter was deferred by said parties for further investigation and determination.

"To the seventh question, they say that we believe that Langdeau did inform Burge & Allen, and Cullers & Henry, and Roberts, Willis, Taylor Co. that the estimate that he had made of the loss was as close as he could come at it until further data was procured; it was after Langdeau found that part of the books were destroyed by fire.

"The eighth question is, did the said Langdeau intend to waive any stipulation or condition of the policy when he undertook to investigate the amount of loss? To which they answer, we find from the written agreement that Langdeau did not waive any stipulation or condition when he undertook an investigation of the amount of loss.

"To the ninth they answer, the insurance companies did not intend to waive any stipulation or condition of their policies.

"To the tenth they answer, yes, the said Langdeau did lead the plaintiffs to believe that the said companies would waive the iron safe clause in said policies in reference to the production of the books. His conduct was of such a nature as to lead a man of ordinary prudence to believe that the said companies waived said iron safe clause. We say that the plaintiffs were put to some expense and trouble in getting up duplicate invoices.

"To the eleventh they answer, Langdeau did not tell Burge & Allen that the insurance companies would waive any breach of the policies that might exist by reason of any failure on the part of Burge & Allen to observe the iron safe clause.

"To the twelfth they answer, we find that Langdeau did tell Burge & Allen that he would report the loss to the companies and they would determine what action they would take in the matter.

"To the thirteenth they answer, we say that Burge & Allen and the parties to whom they assigned their policies were to some expense and trouble in obtaining the said duplicate invoices in the belief that by so doing the said Langdeau did waive the iron safe clause.

"To the fourteenth they answer, we find that Langdeau was informed by George Henry, of the firm of Cullers & Henry, that the duplicate invoices had been gotten up. This was before the suit was filed.

"The court in the fifteenth question submitted to the jury the answer as to what the word 'inventory' in the iron safe clause meant, in the following words: At the time of the issuance of said insurance policies what was generally understood among merchants and in business circles by the word 'inventory,' that is, was said word 'inventory' generally understood among merchants and in business circles to mean an itemized list of the articles composing a stock of merchandise with the prices of such articles, and the extensions and total footings; or was said word generally understood among merchants and in business circles to mean a summary of such an itemized list showing the classes of the articles composing a stock of merchandise and the total values of such classes? To which they answered, we can not agree as to the word 'inventory' in question 15.

"To the sixteenth they say, we find that the stock of merchandise that was destroyed at Ector at the time of the fire was worth $2500.

"To the seventeenth, we find the fixtures of Burge & Allen at the time of the fire to be worth $115.

"The eighteenth question was as follows: From an examination of the books of Burge & Allen that they preserved from the fire, could the amount of all their sales, both for cash and on credit, during the time said policies were in force, be ascertained with substantial correctness? To which they answer, from an examination of the books of Burge & Allen that they preserved from the fire we find that a correct amount of the loss can not be arrived at.

"The books preserved by Burge & Allen and produced after the fire did not show a record of the business transacted by them, including all purchases and sales made by them both for cash and on credit, the credit sales covered by said scratch book and the ledgers were destroyed by fire, not being shown by the books preserved."

The iron safe clause contained in the policies is as follows:

"The assured under this policy hereby covenants and agrees to keep a set of books showing a record of business transacted, including all purchases and sales, both for cash and credit, together with the last inventory of said business; and further covenants and agrees to keep such books and inventory securely locked in a fire-proof safe at night, and at all times when the store mentioned in the within policy is not actually open for business, or in some secure place not exposed to a fire which would

destroy the house where the business is carried on, and in case of loss the assured agrees and covenants to produce such books and inventory, and in the event of a failure to produce the same, then this policy shall be deemed null and void and no suit or action shall be maintained thereon for any such loss."

It was further shown that Burge & Allen while in business kept a set of books, consisting of a scratch book in which entries were made of each sale, whether for cash or credit, and ledgers on which each sale was posted from these scratch books; a cash book from which cash sales were posted from the scratch book. They also kept invoices of their purchases, which they posted on a book kept for that purpose; also a total amount of the invoices, and the names of the parties from whom the purchases were made. Said scratch book, which contained the ledger entries of said business for several months after March 1, 1892, and a ledger called ledger D, in which entries of the credit sales on the scratch book covered a period from January 1, 1892, to August 1, 1892; and the ledger called ledger C, in which were posted the entries of credit sales for prior to January, 1892, were all destroyed in said house by fire, together with the original invoices of purchase and the book containing the items of the inventory. Only a few of the balances of the accounts in ledger C were posted in ledger D.

On August 1, 1892, Burge & Allen commenced a new ledger called ledger E, by posting therein the balances after the first of August on ledger D; and they continued to use this ledger E in posting from their scratch book from August 1, 1892, until the fire occurred, and did not use ledger D any more. They carried home with them every night the books that they were using, as they had no iron safe, but they did not carry home any of the scratch books nor ledgers C and D, because they had ceased to use them. They preserved and produced after the fire said ledger E and their cash book covering their cash transactions from January 1, 1882, up to the time of the fire, the scratch book they were using, and the books containing the total amount of their purchases. Their books were correctly kept.

There was no waiver by said companies or their agent of forfeiture by reason of the assured's failure to produce the last inventory taken by them.

Said policies also contained the following clause: "In the event of a disagreement as to the amount of the loss, the same shall, as above provided, be ascertained by two competent and disinterested appraisers; the insured and this company each selecting one, and the two so chosen shall first select a competent and disinterested umpire; the appraisers together shall then estimate and appraise the loss, stating separately sound value and damage, and, failing to agree, shall submit their differences to the umpire, and the award of any two in writing shall determine the amount of such loss."

There was an effort made to ascertain the amount of the loss, but the matter was deferred by said parties for further investigation; and, while

no definite understanding was reached, we find that there was no such disagreement as is contemplated by the terms of the policy as to require a submission of said matters to appraisers.

*Opinion.*—The controlling issue for determination is, whether or not appellants complied with the terms of the clause in the policies known as the "iron safe clause," which is heretofore set out in the conclusions of fact. The evidence discloses that the inventory and some of the books required to be securely kept by the terms of said iron safe clause were not so kept, and were destroyed by the fire that consumed the building and stock of goods covered by the policies.

It is insisted by appellants that said clause was not a promissory *warranty,* but a representation, and that the failure of the assured to comply therewith did not work a forfeiture. This contention is not well grounded. We think it clear that such clause was a warranty, and the failure to comply therewith worked a forfeiture of the policies.

When the last inventory was taken, Burge & Allen entered in a book in which the postoffice business was kept, but which had no connection with their mercantile business, the following summary of the contents of said inventory, viz.:

| | |
|---|---:|
| Dry goods, boots, shoes, and clothing | $1,210 00 |
| Groceries and hardware | 800 00 |
| Drugs and medicines | 420 00 |
| Jewelry | 350 00 |
| Books and stationery | 100 00 |
| Fixtures | 158 45 |
| | $3,036 45 |

which book was not burned. The contention of appellants is that said summary fully complies with the terms of said clause as to preserving an inventory, and this contention is supported by the decision of this case on a former appeal by the Court of Civil Appeals, Fourth District. 35 S. W. Rep., 955. But we can not concur in this view. Which of these views is correct depends upon the meaning of the word *inventory* as used in said clause. Mr. Black defines said work to be, "a detailed list of articles of property; a list or schedule of property, containing a designation or description of each specific article; an itemized list of the various articles constituting a collection, estate, stock in trade, etc., with their estimated or actual values." Black's Law Dict., p. 643. Mr. Bouvier defines *inventory* to be "a list, schedule, or enumeration in writing, containing, article by article, the goods, chattels, rights, and credits, and in some cases, the lands and tenements of a person or persons." Bouv. Law Dict. (Rawles' Rev.), p. 1119. To the same effect are the Standard, Webster's, and Encyclopædic dictionaries.

These authorities clearly show that the ordinary, usual, and accepted meaning of the word is an *itemized list* or an enumeration, article by

article, of property. The summary above set forth does not comply with these requirements. It fails to *enumerate* the various articles and the price thereof that composed the dry goods on hand when the inventory was taken. It also fails to show the number of pairs of boots and shoes, or the number of suits of clothing, and so on with the other merchandise named. From this summary the insurance company would have no means of arriving at the correctness of the amount of stock or the value thereof. If the different articles that went to make up the dry goods, etc., and the value thereof, were enumerated and specified, it would be a guide in arriving at the quantity of merchandise on hand and the value thereof, which was evidently in contemplation of the parties when the contract of insurance was entered into. Appellants claim, however, that among the merchants the term "inventory" is not restricted to the meaning as we have here construed it; but that the term would embrace the *summary* within its meaning. This contention was attempted to be established by the introduction of testimony; but we are of the opinion that it wholly fails to show that it was a general custom among merchants to use said word in any other sense than that commonly given it. When a meaning is attempted to be given a word in a contract different from that given it in common usage, it must be shown that it was so general and well established that it may be presumed to have been used in that technical sense by the parties when the contract was entered into.

Appellants offered to introduce clauses of policies issued by other insurance companies where the term "itemized inventories" was used, as tending to show that the word "inventory" alone would not necessarily embrace "itemized list," etc. This testimony was excluded by the court, and we think properly so. What other companies saw proper to insert in their policies could have no controlling effect upon appellees' contracts. Besides, the term "inventory" is as comprehensive as "itemized inventory," for it means an itemized list or schedule.

We think the court erred in instructing the jury to the effect that the books preserved by Burge & Allen did not show a record of the business transacted by them, etc. There was some evidence on this phase of the case, and whether the books preserved would sufficiently show the purchases and sales so as to substantially comply with the iron safe clause, should have been left to the jury. This error is immaterial under the view we take of the case as hereinafter set forth.

Some of the answers of the jury to the special issues submitted are in conflict; and appellants contend that where such is the case the court can not render judgment, as to do so would be virtually withdrawing the case from the jury. We think this contention would be correct if there was a conflict on material issues. Under such a state of case the matters should be resubmitted to the jury that they might reach proper conclusions. If they could not then agree, the result would be as in any case where the jury failed to agree. Under the facts of this case, however, no other judgment could have been legally rendered, and the conflict becomes immaterial. The failure to preserve the inventory taken by

Burge & Allen on March 1, 1892, was a clear violation of the "iron safe clause," which worked a forfeiture of the policies. The contention that such forfeiture was waived by Langdeau in stating that duplicate invoices were necessary in order for him to make an estimate of the loss, and in consequence of such statement appellants were put to the extra expense of procuring such duplicates, is not tenable. Langdeau was making an estimate of the loss at the request of the parties, and it was agreed in writing that in making the necessary examination and investigation for that purpose the same should not be taken as a waiver, direct or implied, of said clause. What Langdeau did in the matter was clearly in pursuance of said agreement, and his statements or acts in that connection should not be tortured into a waiver of the forfeiture. The judgment is affirmed.

*Affirmed.*