**COMMONWEALTH UNDERWRITERS' AGENCY OF REPUBLIC INSURANCE CO. OF TEXAS v. LAWRENCE GROCERY CO. et al.   (No. 8216.)** *

(Court of Civil Appeals of Texas. Galveston. June 22, 1922. Rehearing Denied Oct. 5, 1922.)

1. **Insurance ☞335(2)—Inventory held not to conform to policy requirements.**

Insured failed to fulfill her covenant to take "complete itemized inventory of stock," where articles were listed without showing quantities or unit costs.

2. **Insurance ☞335(3) — Insured held not to have kept record of business transacted as required by policy.**

Insured failed to fulfill her covenant to keep a "complete record of business transacted," where she and her five children satisfied personal living necessities by using insured goods without keeping any record thereof.

3. **Insurance ☞335(3)—Insured held not to have kept sales record as required by policy.**

Insured failed to fulfill her covenant to keep a sales record, where there was no itemized enumeration of articles disposed of, but merely memoranda showing lump sums for the day's sales, irregularly kept.

4. **Insurance ☞335(3)—Insured held not to have kept record property going into premises as required by policy.**

Insured failed to fulfill her covenant to keep a record of "all the property which should go into the premises and be added to the stock," where merely a statement of names purporting to be insured's sellers, after which appeared lump sums of purchases, was kept.

5. **Insurance ☞335(1) — Insured's violation, though not fraudulent, of iron safe and record warranty clauses, held to bar recovery.**

A clear violation by insured of the "iron safe" and "record warranty" clauses of her policies, through inexperience, though not fraudulent, carries with it its own consequences, which the courts have no power to alter.

6. **Insurance ☞335(2) — Insured's inventory must show classes of property and afford insurer test of reasonable valuations.**

A policy clause providing for an "itemized inventory of stock" to be taken by insured *held* to require an inventory affording insurer a test whether the stock was composed of classes of property insured and whether valuation attached to different items was reasonable.

Appeal from District Court, Brazos County; W. C. Davis, Judge.

Action by the Lawrence Grocery Company and others against the Commonwealth Underwriters' Agency of the Republic Insurance Company of Texas. From a judgment for plaintiffs, defendant appeals. Reversed and rendered.

Lamar Bethea, of Bryan, and Coke & Coke, of Dallas, for appellant.

Henderson & Ranson, of Bryan, for appellees.

GRAVES, J. The appellee grocery company, assignee of Mrs. H. H. Grimes, sued appellant on three policies of fire insurance for one year, each issued by it to Mrs. Grimes on her stock of merchandise at Marquez, Leon county, Tex., one dated October 1, 1920, for $2,000, the other two for $1,000 each, dated, respectively, November 6 and 10, 1920. All three contained a clause limiting the amount of concurrent insurance permitted on the property, two of them fixing it at $4,000, and the other at $5,000, further provided that the policy should be void if the insured had or should procure other insurance on the property covered in whole or in part by it, unless consent therefor was indorsed on the policy, and also contained this, "iron safe" or "record warranty" clause:

"The following covenant is hereby made a part of this policy and a warranty upon the part of the assured:

"Section 1. The assured will take a complete itemized inventory of stock on hand at least once each calendar year, and within 12 months of the last preceding inventory if such has been taken. Unless such an inventory has been taken within 12 calendar months prior to the date of this policy, and, together with a set of books showing a complete record of business transacted since the taking of such inventory, is on hand at the date of this policy, one shall be taken within 30 days after the date of this policy, or in each and either case this entire policy shall be null and void.

"Section 2. The assured will make and prepare, in the regular course of business, from and after the date of this policy, a set of books, which shall clearly and plainly present a complete record of business transacted, including all purchases, sales, and shipments, both for cash and on credit, or this entire policy shall be null and void.

"The term 'complete record of business transacted,' as used above, is meant to include in said set of books a complete record of all the property which shall go into the premises and be added to the stock, and of all property taken from the stock, whether by the assured or others, even though not technically purchases or technically sales.

"If the business of the assured under this policy be that of manufacturing, this complete record of business transacted must, in addition, show all the raw material received and all products manufactured therefrom, including the cost of manufacture, and must show waste in process of manufacture, and must show all the raw material and manufactured property which is taken from the building described.

"Section 3. The assured will keep and preserve all inventories of stock taken during the current year, and also all those taken during the preceding calendar year, which are on hand when this policy is issued, and will keep and

preserve all books which are then on hand, showing a record of business transacted during the current calendar year and the preceding calendar year.

"The assured will also keep and preserve all inventories taken after the issuance of this policy, and all books made and prepared after the issuance hereof, showing a record of business transacted.

"The books and inventories, and each of the same, as called for above, shall be by the assured kept securely locked in a fireproof safe at night, and at all times when the building mentioned in the policy is not actually open for business; or, failing in this, the assured shall keep such books and inventories, and each of them, in some secure place not exposed to a fire which would destroy said building, and, in event of a loss or damage insured against to the personal property mentioned herein, said books and inventories, and each of same, must be by the assured delivered to this company for examination, or this entire policy shall be null and void, and no suit or action shall be maintained thereon for any such loss.

"It is understood and agreed that this clause and the requirements thereof is one of the inducing causes to the acceptance of the risk herein assumed and the issuance of this policy, and that the terms and requirements hereof are material to the risk, and to this insurance, and to any loss or damage happening to the property described in this policy.

"It is further agreed that the receipt of such books and inventories, or the request for them or either of them, and the examination of the same, shall not be an admission of any liability under this policy, nor a waiver of any provision or condition of this policy, or of any defense to the same."

In each of the policies there was also a stipulation to the effect that no agent of the company could waive any provision or condition thereof, except such as its terms permitted to be done by indorsement on or addition to it, and then only when such waiver was actually written upon or attached to the instrument.

The grocery company alleged the assignments to it, the destruction of the property by fire on December 29, 1920, while all the policies were in force, the making of proper proofs of loss, and asked judgment for the aggregate face amount of the three policies, $4,000, with interest and costs.

In answer, the insurance company set up, among others not deemed material here, these defenses: (1) That assured took out a policy of $1,200 in the Superior Fire Insurance Company on the 16th day of December, 1921, without the consent of the defendant, and contrary to the provisions of the policies, by reason of which they became void; (2) that the assured failed to comply with the record warranty clause in the policies hereinbefore copied, in that there was a failure to make and keep the books, records, inventories, etc., therein required.

By supplemental petition the grocery company additionally averred, along with some other matters, that all insurance on the stock of Mrs. Grimes was issued by the same agent, E. O. Boggs, who was agent of defendant, and that he had knowledge of all the insurance carried and of the total concurrent insurance thereon.

On a trial before the court without a jury, judgment for $4,000 asked went for the grocery company; hence this appeal by the insurance company.

Findings of fact and conclusions of law filed by the court below, after recitations to the effect that the polices sued on were duly issued to Mrs. Grimes by appellant through its agent, E. O. Boggs, the regular assignment thereof to the appellee grocery company, and, while they were all in force, the total destruction, on December 29, 1920, of the goods covered thereby by a fire of unknown origin, continued as follows:

"(4) That Mrs. H. H. Grimes, as provided in said policies, complied with the various warranties and conditions in said policies contained; that an inventory was taken on January 1, 1920, a record of the merchandise purchased during the year of 1920 was kept, and that record of the sales made during said year was kept; that another inventory was taken on November 30, 1920; that both of said inventories and all said books and records were produced in court on the trial of this cause; that from same the loss could be determined, and same shows a substantial compliance with the record warranty and iron safe clauses in said policies; and I find that same were complied with.

"(5) I find that the agent, E. O. Boggs, represented both the defendant and the Superior Insurance Company, and delivered all of the policies which the said Mrs. H. H. Grimes owned, and which covered the loss, and that he, the said Boggs, examined the inventory of November 30, 1920, and told the insured that there was not enough insurance on her stock of goods, and then wrote and delivered to the insured an additional $1,000 policy; that the said agent was cognizant of the condition of said stock as shown by said inventory, and that he wrote and delivered all the policies which the insured had.

"(6) I find the additional insurance and the amount of insurance allowed was written by the agent, Boggs, and that he was cognizant of all policies and wrote and delivered them all.

"(7) I find from the evidence that the last inventory was completed on December 3, 1920, and that the fire occurred on December 29, 1920, and that the withdrawals made from said stock of goods for domestic consumption by the family of the insured during the time between the completion of said inventory and the date of the fire was insignificant and negligible.

"(8) I find from the evidence that at the time of said fire the said stock of goods was the property of the insured, Mrs. H. H. Grimes, and that the value of said stock of goods was approximately $8,500, and that the total insurance in force at the time of said fire was $6,200.

"(9) I find from the evidence that the insured tendered to the adjuster for the defendant, after the fire, all books, inventories, etc., and that the said adjuster refused to accept same, or to inspect same.

"Conclusions of Law.

"Based upon the above findings of fact, I conclude as a matter of law:

"(1) That the insured, Mrs. H. H. Grimes, complied with all the conditions and warranties of said policies.

"(2) That the defendant, through its agent, had notice and knowledge of the amount of insurance carried on said stock, and therefore waived any objection as to total concurrent insurance.

"(3) That the defendant is liable under said policies to the assured, Mrs. H. H. Grimes, and to the plaintiff, Lawrence Grocery Company, for the full amount of said policies of insurance, to wit, $4,000."

After attacking all the quoted findings of both kinds as being unsupported and unjustified, appellant assails the judgment as being erroneous, among other grounds it is not deemed necessary to discuss, because (1) the evidence shows that the inventory of January 1, 1920, was not in compliance with the terms of the policy contract; (2) the evidence shows that the inventory of November 30, 1920, did not comply with the policy contract; (3) the evidence shows that the plaintiff did not comply with the record warranty in the policies, in that goods were taken from the store in substantial quantities, of which no record was made; (4) the evidence shows the purported record of sales for cash and credit does not correctly show the same.

A careful consideration of the record and of the statement of facts has convinced this court that each and all of these objections are good and must be sustained. The evidence is to all intents and purposes undisputed, and comes in the main from witnesses for the appellees themselves, the principal ones being Mrs. Grimes and the son and daughter who managed her business and ran her store for her. It is in part documentary, very voluminous, and so not susceptible of being detailed, or even fully summarized, here; but its outstanding features, in addition to what has already been recited, may be thus stated:

The assured procured a policy for $1,200 in the Superior Fire Insurance Company of Pittsburg, Pa., which was outstanding at the time of the fire, making the total concurrent insurance on the stock of goods $6,200, as found by the trial court; that is, $1,200 above the highest limits permitted, consent for this excess not being indorsed on or attached to any of the policies sued on.

[1] Two purported inventories were taken in 1920, one dated January 1st, the other November 30th, but neither was such "a complete itemized inventory" as required in the policies, because there was no attempt to make "an itemized list, or an enumeration, article by article, of the property." Instances of this deficiency, not isolated nor relatively inconsiderable ones, but as typifying the system used throughout both documents, were:

In the January 1st inventory there is no itemization at all for the first 5½ pages, the articles appearing under such designations as "ginghams" eight times, with as many separate values, but nothing indicating the number of yards, bolts, or the price; "prints, $10.40," with no statement of quantity or character; "linen, $19.05"; "lawn" apparently in eight lots, and "sheeting" in seven, nothing appearing as to quantity, kind, or other details; then follow items of "oil cans, $20.00," "jugs, $60.00," "pants, $42.00," and so on. The one bearing date November 30th is similarly defective and insufficient—its first item being 154 pairs shoes, $512.95; another, Watkins' Remedies, $118.95, less 20 per cent., $96.16; still others, Dr. Lear's Remedies, $115.00; books, $10.00; tobacco, $556.20; 48 soap, $289.20; lard, $48.25; sugar, $24.65; ammunition, $101.30; hinges, $5.20; cogwheels, $15.00; spoons, $3.50; curtain rods, $27.00; peaches, $42.80; peaches, $11.50; apples, $11.50; clothespins, $8.00; files, $7.10; fruit jars, $33.70; coffee bulk, $98.72; brooms, $42.10; rice, $7.60.

[2] The family of Mrs. Grimes, consisting of herself and five children, got their living out of the store, except for such provisions as came from her farm, using out of this insured stock of merchandise all the groceries, dry goods, house furnishings, and other things they needed, the amount of these consumptions being estimated to run from $50 to $90 per month during the year 1920, and no record of any sort being kept of them; this in the face of the special provision appearing in that part of the record warranty clause, relating to the keeping of a set of books, that:

"The term 'complete record of business transacted,' as used above, is meant to include in said set of books a complete record of all the property which shall go into the premises and be added to the stock, and of all property taken from the stock, whether by the assured or by others, even though not technically purchases or technically sales."

These withdrawals occurred during the other 11 months of the year 1920, and are therefore unaffected by the trial court's quoted seventh finding of fact.

[3] As concerns the record kept of sales, either for cash or credit, there is likewise a pronounced breakdown. In neither instance was there ever any itemized enumeration of the articles disposed of, but merely memoranda showing lump sums for the day's sales, without details of any nature; not even these were regularly or accurately kept, because the lists containing the amounts

were sometimes lost and never entered on the books at all. Members of the assured's family freely took small sums all along from the cash drawer, without keeping any account of them whatever; cash collected on account of credit sales was often indiscriminately mingled with the sales for cash, and sometimes the lump sum records of the sales on credit were kept by the month only, notably in October and November of 1920; indeed, on many days when cash sales were shown to have been made, no entry of them of any kind was made.

[4] The further requirement that the assured keep "a complete record of all the property which should go .into the premises and be added to the stock" lacked much of being complied, with. The only record on this feature of the business for 1920 was termed the "merchandise account," shown in a book sent up with the record here and designated "1919 bank book." It furnishes no details, but merely a statement of names— perhaps those of the persons from whom the goods were bought—and opposite to each of these an amount, for instance, "Pope Wholesale Co., $554.80;" there being nothing by which the character of the goods, the number of articles, nor the prices paid could be determined.

[5] That the books and record thus kept both failed to constitute a substantial compliance with the iron safe clause involved, and to afford an adequate basis for determining with reasonable certainty what actual loss resulted to the assured from the fire, seems to us, under our authorities, free from doubt. The rule upon this subject, as recently laid down by our Supreme Court, through the Commission of Appeals, is thus stated in Merchants' & Manufacturers' Lloyds v. Southern Trading Co., 229 S. W. 312:

"The purpose of the bookkeeping provision is to provide a' means *by the books themselves* for ascertaining the amount of the loss. *The insured binds himself to. provide such means,* and a clear violation of this provision of the contract carries with it its own consequences, which the courts have no power to alter. It certainly cannot be said that the books themselves comply either with the letter or the spirit of the bookkeeping clause, when they utterly fail to show what property went into or was taken from the premises which are designated .in each policy as containing the entire subject of the insurance, in so far as the personal property insured is concerned"—the italics being ours.

[6] Concerning the itemized inventories provided for, to constitute even a substantial compliance, there must be "an itemized list, or an enumeration, article by article, of the property," to the end "that the insurance company may test the correctness of the claim in two respects: (1) Whether the ar-

ticles of which the stock was composed all belonged to the classes of property covered by the policy; and (2) whether the valuation attached to the different items and which went to make up the total sum expressed, was reasonable." Roberts et al. v. Insurance Co., 19 Tex. Civ. App. 338, 48 S. W. 559; Insurance Co. v. Kemendo, 94 Tex. 367, 61 S. W. 1102. The same principles are declared in Dorroh-Kelly Co. v. Insurance Co., 104 Tex. 199, 202, 135 S., W. 1165; Fire Ass'n v. Calhoun, 28 Tex. Civ. App. 409, 67 S. W. 153; Fire Ins. Co. v. Walker (Tex. Com. App.) 210 S. W. 682; Fire Ins. Co. v. Yarbrough (Tex. Com. App.) 215 S. W. 842.

That the "merchandise account" in this instance neither furnished "a complete record of all property which went into the premises and was added to the stock," nor was such a book itself as provided a means or premise for ascertaining the amount of the loss is, we think, clear under such authorities as Ætna Ins. Co. v. Johnson, 127 Ga. 491, 56 S. E. 643, 9 L. R. A. (N. S.) 667, 9 Ann. Cas. 461; Homo Ins. Co. of New York v. Williams, 237 Fed. 171, 150 C. C. A. 317; Ins. Co. of North America v. Williams, 200 Ala. 681, 77 South. 159.

No fraud in any respect appears to have been involved here, only inexperience, lack of knowledge, and neglect, and it may be that individual hardship will be entailed by the nonenforcement in appellees' favor of these policies; but that contemplation cannot justify a court in declining to apply the law as it is written. There is no doubt here as to what the parties have agreed upon, nor any as to what ensued therefrom. In such a situation the court's duty is well expressed by Judge Brown in the Kemendo Case, supra:

"The facts of this case show that there may be a very great hardship resulting from this determination between the parties, but it has . been said that 'hard cases make bad law.' It is not the province. of the court to adjust the construction and enforcement of a contract to the results which may be produced upon the parties, but it is better that those who make hard contracts shall suffer the result than that the law shall be so warped and distorted as to disturb the business of the country and to render the power of contracting uncertain and unreliable."

A like declaration is aptly made by the Supreme Court of Georgia in Southern Fire Ins. Co. v. Knight, 111 Ga. 622, 36 S. E. 821, 52 L. R. A. 70, 78 Am. St. Rep. 216.

There are other issues presented, but what has been said disposes of the merits of the appeal. The facts appear to have been fully developed, and, under the conclusions stated upon them, the several contracts of insurance become void and unenforceable by appellees. The judgment of the court below is accordingly reversed, and this court's

judgment will enter rendering the cause in favor of appellant.

Chief Justice PLEASANTS, being disqualified, did not sit.

Reversed and rendered.