(132 So. 23)

## NATIONAL-BEN FRANKLIN FIRE INS. CO. v. SNIDER.

### 6 Div. 525.

Supreme Court of Alabama.

Oct. 30, 1930.

Rehearing Denied Jan. 29, 1931.

Coleman, Coleman, Spain & Stewart, of Birmingham, for appellant.

T. B. Ward and J. M. Ward, both of Tuscaloosa, for appellee.

THOMAS, J.

The trial was had upon count 1 in Code form, to recover damages for fire loss.

Defendant's pleas were based on certain alleged breaches of material provisions of the policy on plaintiff's stock of merchandise furniture, and fixtures; the insurance being, respectively, $1,000 on merchandise and $300 on fixtures.

■ The provisions of policies of fire insurance for making and preserving inventories and books under the iron-safe clause are well understood, are reasonable, and intended to be effective for the prevention of fraud and a breach of contract. Penn. Fire Ins. Co. v. Malone, 217 Ala. 168, 115 So. 156, 56 A. L. R. 1075; Insurance Co. of North America v. Williams, 200 Ala. 681, 77 So. 159; Fidelity-Phoenix Ins. Co. v. Williams, 200 Ala. 678, 77 So. 156; Hanover Fire Ins. Co. v. Wood, 213 Ala. 132, 104 So. 224, 39 A. L. R. 1436; Chamberlain, Trustee, v. Shawnee Fire Ins. Co., 177 Ala. 516, 58 So. 267; Day v. Home Ins. Co., 177 Ala. 607, 58 So. 549, 40 L. R. A. (N. S.) 652; Georgia Home Ins. Co. v. Allen, 128 Ala. 451, 30 So. 537.

These provisions have for their purpose the preservation and exhibition, with reasonable certainty, of the record history of the conduct of the business of assured with respect to the quantum and value of his goods that are destroyed.

■■ When the parties have stipulated for books and inventories as the record of said business, the material features of the same may not be established by parol evidence.

Fidelity-Phoenix Ins. Co. v. Williams, 200 Ala. 678, 77 So. 156. The requirement in the iron-safe clause of a record of business "excludes recourse to parol suggestion, except for the limited purpose of explaining or elucidating the insured's bookkeeping method," system, or entries. To do this there must be a substantial compliance with the contract provision. Mississippi Fire Ins. Co. v. Perdue, 217 Ala. 293, 116 So. 142, 62 A. L. R. 626; London Assur. Corp. v. Poole, 212 Ala. 109, 101 So. 831; Penn. Fire Ins. Co. v. Malone, supra. The breach of such condition subsequent avoids a policy. Georgia Home Ins. Co. v. Allen, 119 Ala. 436, 24 So. 399.

■ The effect of incumbrances that are undisclosed and warranties of title were the subjects of consideration in Girard Fire Ins. Co. v. Gunn (Ala. Sup.) 130 So. 180;[1] Gunn v. Palatine Ins. Co., Ltd., etc., 217 Ala. 89, 114 So. 690; North River Fire Ins. Co. v. Waddell, 216 Ala. 55, 112 So. 336, 52 A. L. R. 838. There was no error in instructing the jury as was done in the oral charge as to incumbrances. Wallis v. Long, 16 Ala. 738.

Was the system of books kept by appellee a set of books within the meaning of the provisions of the policy made the basis of this suit? On June 1, 1928, defendant issued its policy on plaintiff's stock of merchandise and furniture; its destruction by fire was of date of August 28th. Appellee operated a barber shop in said building, and opened a restaurant on August 17th, after revision of the rate, made on August 1st, made necessary by inspection of the premises. Plaintiff introduced in evidence certain invoices or statements of accounts with third parties with whom he had dealt in the conduct of his business. They are set out in the record. He explained his method of taking the invoice required and of bookkeeping, as follows:

"When I took out the policy with the National Ben Franklin Fire Insurance Company, I took an invoice of the merchandise and stuff within 30 days. I made an inventory when I first took the insurance, as soon as I got my policy, the first day after I got my policy. * * * At the time I made this inventory, I did not put it in the book right there, no sir, not then. I did this here (indicating). This was put in the book right then. That is the inventory of my fixtures right there. That was taken that very day. From that day on, I was having invoices coming in of merchandise I had bought. I carried most of the invoices to the house as they came in; a few were misplaced. That was all I got between the time I took out the policy and the time of the fire. There may be one or two lost. As to how I kept the record of sales, I just put it down on a piece of paper and carried it to the house, entered it in the book introduced in

[1] 221 Ala. 654.

evidence here. * * * I made the inventory, I called it out to Franklin and he put it down. I know it was correct and the figures were properly put down. I saw them as they were put down. I was counting the stuff on the shelves, of course, while I watched him put it down. The value of the merchandise in the store there at that time as shown by these figures was right around $2500.00. These figures here are correct. * * * This inventory that I took on the first day of June was immediately after I took out the policy of insurance. After that date, I sold merchandise and bought merchandise for the store. These two invoices are for stuff and merchandise I acquired from June 1st up to the date of the fire. A few got misplaced. With the exception of a few, these constitute all of the invoices of merchandise that I purchased from June 1, 1928, up to August 28, 1928. Some of them got lost. I don't know exactly how many. On the day of fire, I saw the merchandise and feed stuff I had in my store and on the shelves, and the fixtures. Looking at this book here, I state to the court and the jury that I sold on June 1, 1928, $8.-15; on June 2d, $16.40; on June 4, $7.65; on June 5th, $9.25; on June 6th, $11.30; on June 7th, $10.05; June 8th, $9.70; June 9th, $15.-25."

Witness testified that the sales were copied from slips of paper which he carried to his home from day to day and placed in a tin box kept for that purpose. The inventory was in evidence. Witness said of his business method and system of bookkeeping:

"After I took out the insurance policy before the fire burned me out, I sold stuff out of my stock. When I bought the stuff, the creditors or the firms from whom I bought it sent me statements. I didn't put these statements on the book. I had a tin box at the house, kept them in the chifforobe. * * * I can't tell by looking at these invoices just how much goods I bought during that entire period from June 1st until August 28th. These invoices were not put on a book or kept on a ledger account. I didn't keep any accounts upon the ledger. This bunch of invoices here are the only ones that I kept showing the account of the stuff that I bought. That is correct. * * * That box is at home. I did not keep them in an iron safe. I had them there in that tin box in the dwelling house. That was 300 yards away. * * * In addition to the invoices and the book marked plaintiff's Exhibit A-1, I kept my tickets in there, I mean my charge tickets, the tickets I kept my sales on. * * * Each night I took the tickets to the house. I carried the invoices to the house, each night I received them. I kept the McCaskey register at the store. * * * I didn't use the McCaskey tickets for the cash tickets. I had one of these little books there, when I counted it up, I wrote down how much it was; when I carried it to the house, tore it up. When I took the tickets out, I just wrote up the amount on a little slip and left the tickets at the store. In other words, I would have as many as half a dozen tickets at the end of the day. As to what I did with the charge tickets or the tickets I took this total off of, I kept them at the house in the box. * * * I had a cash register that I looked at—the cash register every night. I didn't keep any tickets, I just looked at the cash register. I kept every amount. I am talking about cash. I looked at the cash register, got the money out, put it down on a piece of paper, put the total of the cash register on a piece of paper and tore the little strip off, and that represented all that day's sales. I took the tickets to the house, kept them at the house in a box until I drawed it off and put it on there. I had to consult the cash register to see how much was taken in that day. * * * Each night I would go to the cash register and count up my totals. Then I tear off that slip, take the slip to my house and keep it until, and enter it on the book when this man came around. That is the record I kept. I did not keep any other tickets. I don't know the exact amount of credit sales after that time. My McCaskey register showed that definitely. I carried on business by that means from the time I took out the policy, and some of the accounts I had not collected I carried on the register. Whenever a new customer would come in and wanted to buy anything on credit, I simply made a little ticket for it and put it on the McCaskey register. * * * Looking at page 3, beginning August 1st and ending August 28th, total $382.65. I don't know how much of that represents goods sold out of my stock, how much goods sold out of my restaurant and how much sold in my barber shop. I could add up all together what I got there in goods that I sold at retail beginning June 1st and ending August 28th. * * * As to how much I sold all together, I got it down here, I can add it up. I am positive that represents only cash sales. Beginning on June 1st and ending on August 28th, that represents cash sales from the barber shop, from the store and from the restaurant. That is all the cash I took in from all three of them. That is what these three pages represent. As to whether they are all mixed up together, I said a little while ago sometimes a little barber money came in, sometimes it wouldn't. It all belonged to me and I wasn't so particular about it. I have a family composed of wife and one child. I got the goods I lived on out of the store. When my wife wanted anything for the table, she went down to the store and got it. I made no notation of it. I don't know how much I took out of the stock from June 1st until August 28th, about 30 dollars a month. I didn't keep any books at all on the amount that my family used. * * * Everything I sold out of

the store I put it in the cash register when I sold it. If anybody came in with some butter, I would generally take the money out of my pocket to pay for it. If I needed it, I took it out of the cash register. When I took these cash register tickets to the house, I took a corresponding amount of money along with me. I hardly ever paid anything out of the cash register. I had money in my pocket I took in from the barber shop to buy a little butter and milk. I have taken money out of the cash register. 1 kept no particular account of that. I always just looked at it every night and put it down. * * * I testified a while ago that the invoices are the only record that I kept of the purchases of the store. As to these invoices that you read off to me being the only record I kept, I didn't make any entries of these invoices but I got all of the invoices. ‧ I testified on direct examination that these were not all the invoices. I don't know how many of them are lost; I couldn't estimate that. I don't know how they got lost when I kept them in that little iron box. I lost a few of‧ them going back and forth to the house carrying them in my book. I don't know how many I lost but those I lost I didn't keep in an iron box."

The invoices were introduced in evidence.

■ The foregoing excerpts from plaintiff's evidence indicated his method or system. We think it is shown with reasonable certainty by these records kept of assured's business transactions, including purchases, cash and credit sales, that there was no reversible error in charging the jury as to these features of the case.

The opinion evidence as to the value of the stock of goods at the time of the fire was‧not for the purpose of supplementing plaintiff's records, but for proving his loss and the amount of liability in making out his prima facie case and in going forward with his evidence.

■■ The mortgagee had the right to release his mortgage lien on the stock of merchandise and fixtures that was inadvertently or erroneously inserted in the mortgage. Such an instrument would have been reformed in equity had not the parties agreed to the release and sale in question. The plaintiff testified that he had a mortgage drawn and sent to Mr. Gwin, the mortgagee, and the latter came to him and said he did not want the groceries and fixtures in the mortgage; that it was not intended for them to be put in there; that "all he wanted was a mortgage on the place" specifically described; that if the mortgage was made to embrace the "fixtures, groceries and stuff that way, I (plaintiff) couldn't sell them, so he said he would just leave that out," and told plaintiff to sell the "stock of merchandise," and he did so sell. Abbeville Live Stock Co. v. Walden, 209 Ala.

315, 96 So. 237; Wallis v. Long, supra. The mortgagee testified that he released the stock of merchandise and fixtures described in the mortgage a few weeks after the same was given; that the mortgagor sold, in due course, from the stock of merchandise embraced in said mortgage; that no additional consideration was paid for the release, and that it was a "verbal contract between" or understanding of the parties that entered into acceptance of the mortgage by the mortgagor; that he later gave a written showing of the release. The jury may infer from the evidence, and indeed that is the natural inference, that the release per agreement of the parties was consummated long before the issuance of the insurance affected the delivery and acceptance of the mortgage. It therefore entered into the statement of fact of mortgage vel non and misrepresentations that affected the risk. In this respect the instant case is different from Security Ins. Co. v. Laird, 182 Ala. 121, 62 So. 182, where the question of a changed status or release was after the insurance was issued. North River Ins. Co. v. Waddell, supra.

When the whole of the oral charge is considered on the question of the chattel mortgage to be given, and as delivered and accepted, and its release, there was no error in the instructions given to which exception was reserved.

■ There was no error committed in the cross-examination of witness Gwin. It shed material light upon the true intent of the parties to the mortgage at the time the same was given and long antedating the insurance, and on which they had consistently acted.

■ It was proper to show by witness Mize, defendant's agent who issued and delivered the policy, that he knew and visited or inspected the premises, and was informed of its use and nature and the extent of its use for cooking. It also tended to explain the condition under which the policy was issued and the rate charge thereafter increased. Southern States Fire Ins. Co. v. Kronenberg, 199 Ala. 164, 74 So. 63.

■ We advert to plaintiff's testimony to say that on authority of Aetna Insurance Company v. Fitze, 34 Tex. Civ. App. 214, 217, 78 S. W. 370, we hold, in the absence of evidence of fraud, that the mere taking from stock of merchandise by the owner for his family support is not a violation of the clause of the policy in question for keeping of books. See, also, Pouns v. Citizens' Fire Ins. Co., 144 La. 497, 80 So. 672. The case of Commonwealth Underwriters' Agency of Republic Ins. Co. of Texas v. Lawrence Grocery Co. (Tex. Civ. App.) 244 S. W. 200, is based on special policy provisions as to what complete record of business transacted that covered all property that shall go into the premises, and of all property taken from the stock whether by the

assured or others, even though not technically purchases or technically sales. So are not the terms of the policy before us. See 3 Cooley's Briefs (2d Ed.) p. 2826.

There was no error in refusing the general affirmative instruction requested by defendant.

Affirmed.

ANDERSON, C. J., and SAYRE and BROWN, JJ., concur.